Salvatore CALDERONE, Plaintiff,

v.

NAVIERA VACUBA S/A and Republica De Cuba, Defendants.

NAVIERA VACUBA S/A, Defendant and Third-Party Plaintiff,

v.

MAHER STEVEDORING CO., Inc., Third-Party Defendant.

NAVIERA VACUBA S/A, Defendant and Third-Party Plaintiff,

v.

GARCIA AND DIAZ, INC., Third-Party Defendant.

MAHER STEVEDORING CO., Inc., Third-Party Defendant and Fourth-Party Plaintiff,

v.

GARCIA AND DIAZ, INC., Fourth-Party Defendant.

Salvatore CALDERONE, Libellant,

v.

GARCIA AND DIAZ, INC., Respondent.

United States District Court
S. D. New York.
April 4, 1962.

Fisch & Kaplan, New York City, for Salvatore Calderone, plaintiff and libellant. Richard L. Fisch, Louis Kaplan, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for Naviera Vacuba S/A, defendant and third-party plaintiff. Matthew L. Danahar, Patrick J. Gilmartin, New York City, of counsel.

Alexander, Ash & Schwartz, Trial Counsel for Hanlon & Dawe, New York City, for Maher Stevedoring Co., Inc., third-party defendant and fourth-party plaintiff. Sidney A. Schwartz, Joseph Arthur Cohen, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for Garcia & Diaz, Inc., fourth-party defendant and respondent. John L. Quinlan, John B. Shields, New York City, of counsel.

**WEINFELD, District Judge.**

These are five actions which were tried together under an order of consolidation. All arise out of an accident in which Salvatore Calderone was injured when a Jacob's ladder, which was rigged from the m/s Bahia De Nipe to a lighter alongside, paid out as he was descending from the vessel to the lighter. Calderone was a checker employed by Maher Stevedoring Co., Inc., which was loading and unloading the vessel. He first brought suit against Naviera Vacuba S/A, the charterer of the vessel (hereafter referred to as shipowner) charging unseaworthiness and negligence. Here his claim is that a crew member was responsible for slack in the ladder which allegedly caused the accident.

Naviera Vacuba S/A impleaded Maher Stevedoring Co., Inc. as third party defendant, seeking, in the event it is held liable, indemnity based upon Maher's alleged (1) breach of warranty and (2) active or primary negligence in creating either an unseaworthy condition or an unsafe place to work.

Almost three years after Calderone commenced his civil action against Naviera Vacuba he also filed an admiralty suit based on negligence against Garcia and Diaz, Inc., respondent. Soon thereafter Naviera Vacuba S/A impleaded Garcia and Diaz, Inc. in the civil action as an additional third party defendant with Maher, and Maher impleaded Garcia and Diaz, Inc. as a fourth party defendant. These various claims rest upon allegations that one Charles Arrasate created the slack condition of the ladder and that, although he was on Maher's payroll, he was in fact the employee of Garcia and Diaz, ship's agents for Naviera Vacuba.[1]

In Calderone's action against the shipowner all defendants challenge his claim that the warranty of seaworthiness extends to him. On the other hand, Calderone, as libelant in the admiralty suit, and the shipowner as the third, and the stevedore as the fourth, party plaintiff make common cause that Arrasate was the employee of Garcia and Diaz.[2] We first consider these status questions, since their resolution gives direction to the nature of the rights and duties of the various litigants.

The first issue is whether plaintiff, as a checker of cargo on board the m/s Bahia De Nipe was entitled to the benefit of the doctrine of seaworthiness.

The Supreme Court held in the landmark case of Seas Shipping Co. v. Sieracki,[3] and later reiterated in Pope & Talbot, Inc. v. Hawn,[4] that the duty imposed upon a shipowner to supply a seaworthy vessel extends not only to immediate crew members, but to all who perform ships' services traditionally rendered by seamen. Whether the plaintiff comes within "the range of [this] humanitarian policy"[5] depends upon the nature of his work and its relationship to the ship and to the historic doctrine of seaworthiness.[6]

Plaintiff was employed by Maher, the stevedoring company. His duties were to check cargo delivered to and from the vessel against the ship's manifest, to verify the name, type, weight and measurement of shipments—in sum, to make sure that the right cargo was received

---

1. Under the consolidation order the civil action and the three cross-claims thereunder were to be tried to a jury and the libelant's admiralty suit against Garcia and Diaz, Inc. to the Court. At the start of the trials, the parties to the civil suit waived trial by jury and so all actions were tried to the Court.

2. For convenience Calderone is referred to as "plaintiff" and the respondents as "defendants."

3. 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

4. 346 U.S. 406, 412–413, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

5. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 95, 66 S.Ct. 872, 877, 90 L.Ed. 1099 (1946).

6. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 413, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

or delivered. On the day of the accident he did his usual job. To perform his duties it was necessary for him to board the ship and also to enter upon the lighter. The accident occurred when the plaintiff was proceeding from the vessel to the lighter to check a delivery of cargo.

Counsel have not cited, nor has independent research by the Court disclosed, any case in which the precise point has been decided.[7] A master who had followed the sea in various capacities for forty-three years testified that since 1918 mates and seamen have checked cargo delivered to and from vessels against ships' manifests. These activities were not limited to cargo on the vessel, but included cargo on the dock and also on barges tied up alongside a vessel. He testified that a checker determines whether cargo received from lighters is correct, and if so, a receipt is issued by the vessel, and if incorrect, he notes the shortage; that he checks general cargo for cubic content, weight, measurement and damage. The checker's duties also encompass verification of deliveries directly from shore to ship by truckers and the issuance of receipts; also the obtaining of receipts when the vessel unloads cargo to lighters or others. This witness further testified that to this day these functions are discharged by some mates and seamen, although since about 1936 or 1937 the service has been performed by shoreside checkers such as the plaintiff. No witness was called by any of the defendants to challenge this testimony.

Upon all the evidence, I am satisfied that plaintiff, as a checker of cargo in the loading and unloading of the shipowner's vessel, was performing a type of work that traditionally was carried on by members of a ship's crew and that his activities were so related to the vessel as to entitle him to the protection of the warranty of seaworthiness.[8] Calderone's work was an integral part of loading and unloading the vessel as much as that of any of the stevedores who physically handled the cargo. In the performance of his duties he was exposed to the same risks as any member of the stevedore's force. "His need for protection from unseaworthiness was neither more nor less than that of the stevedores then working with him on the ship * * *. All were subjected to the same danger. All were entitled to like treatment under law." [9]

The protection against unseaworthiness has been withheld from shore-based workers in instances where the vessel was not in maritime service, was undergoing a complete overhaul or extensive repair and was not in the control of the owner or operator.[10] But there can be no doubt that under the rationale of Sieracki whenever a vessel is in active maritime service and the shorebased worker is engaged in the ship's service performing seaman's work, whether directly related to loading and unloading the cargo or otherwise, he is entitled to protection against unseaworthiness.[11]

---

7. In Vanderlinden v. Lorentzen, 139 F. 2d 995 (2d Cir. 1944) Judge Learned Hand held with respect to a checker that the shipowner was under a nondelegable duty to use reasonable care to see that plaintiff had a safe approach to the deck of the lighter—i. e., that the "ladder was safe"; this, however, does not answer our inquiry since the claim there was predicated upon negligence.

8. See Norris, Maritime Personal Injuries § 48A, wherein the author, listing the traditional or customary shipboard work of the crew and the working titles of those who perform that work today, includes

"checking and tallying cargo—checkers and tallyers."

9. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 413, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

10. E.g., Roper v. United States, 368 U.S. 20, 82 S.Ct. 5, 7 L.Ed.2d 1 (1961); West v. United States, 361 U.S. 118, 121, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959); United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959).

11. Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 413, 74 S.Ct. 202, 98 L.Ed. 143

Labels are of no consequence;[12] the essential question is whether plaintiff is doing a seaman's job for the ship. As Judge Medina put it—"There is nothing talismanic about the phrase 'loading and unloading.'"[13]

We next consider the status of Arrasate.

In substance, Calderone, as libelant, and the third and fourth parties plaintiff allege that Arrasate was at the time and place of the accident either a general, special or ad hoc employee of Garcia and Diaz, Inc.[14] They, of course, have the burden of proof on this issue.

Arrasate was employed as a harbor master and maintenance man. His duties included placing lighters and barges in proper position alongside vessels for loading and unloading purposes, which was usually done by shifting the lighter or barge from hatch to hatch of the vessel as operations progressed. Arrasate had been on Maher's payroll since March 1957 and all through 1958, the year of the accident. Despite this, Maher's contention (supported by plaintiff) is that Arrasate was not its employee—that he was carried on its payroll only as an accommodation for Garcia and Diaz, who reimbursed Maher for all payments made to or on behalf of Arrasate. Maher's president testified that his corporation exercised no control, supervision or direction of Arrasate in the performance of his work; that at all times he was subject to the control of, and took orders from, Louis Suarez, allegedly the pier superintendent of Garcia and Diaz. Suarez and the officers of Garcia and Diaz categorically denied these contentions. Their

position was that Arrasate was one of the personnel engaged by Maher to carry out its obligations under the stevedoring contract with Naviera Vacuba, for which Garcia and Diaz acted as ship's agents; that the reimbursement of Maher for wages paid to Arrasate was in accordance with the contract and in substance no different from similar charges made for other personnel engaged in servicing the vessel computed at nontonnage rates, instead of at tonnage rates as was the case of the longshoremen who did the physical loading and unloading.

Garcia and Diaz's witnesses disputed that Suarez was the superintendent of the pier and claimed he was a coordinator who functioned at various piers to see that vessels for which Garcia and Diaz acted as agents were adequately serviced. Arrasate, called by the plaintiff, gave contradictory testimony as to his employment, finally testifying that he did not know whether he was working for Maher or Garcia and Diaz.

Out of the conflict of testimony certain facts clearly emerge. Under the stevedoring contract Maher, when it could be done without tugs, was obligated to shift lighters into working position after they had been placed alongside the vessel. Arrasate performed this service. Maher also was required to provide a harbor master for berthing and unberthing lighters. Arrasate was that man.

The Court finds that Maher's dock boss directed Arrasate where to place and shift lighters in loading and unloading; that in moving lighters Arrasate had the assistance of Maher's men; and that Maher's superintendent had authority to and

(1953); Lawlor v. Socony-Vacuum Oil Co., 275 F.2d 599 (2d Cir.), cert. denied, 363 U.S. 844, 80 S.Ct. 1614, 4 L.Ed.2d 1728 (1960).

12. United New York and New Jersey Sandy Hook Pilots Ass'n v. Halecki, 358 U.S. 613, 617, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959); Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 413, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

13. Lawlor v. Socony-Vaccum Oil Co., 275 F.2d 599, 602 (2d Cir.), cert. denied,

363 U.S. 844, 80 S.Ct. 1614, 4 L.Ed.2d 1728 (1960).

14. Cf. Matter of Dennison v. Peckham Road Corp., 295 N.Y. 457, 461, 68 N.E. 2d 440 (1946); Matter of De Noyer v. Cavanaugh, 221 N.Y. 273, 275–276, 116 N.E. 992 (1917); Johnston v. International Freighting Corp., 274 App.Div. 728, 87 N.Y.S.2d 297, motion for leave to appeal denied, 299 N.Y. 798, 87 N.E.2d 689 (1949).

did give him orders; that shortly before the accident he moved the lighter at the specific direction of McAllister, Maher's superintendent; that all directions on that day were given to him by Maher's men and that Suarez gave him no orders.

■ On all the evidence I find that Arrasate at all times during the loading of the m/s Bahia De Nipe worked under and was subject to the direction, control and orders of Maher's supervising personnel and was engaged in furthering its interests.[15] In sum, that he was the employee of Maher.[16] I further find that Arrasate was not then under the direction, supervision or control of Garcia and Diaz. Accordingly, the latter is entitled to a decree dismissing the libel and the third and fourth party suits against it.

Thus, we reach the issues presented in the original suit brought by Calderone against Naviera Vacuba, the shipowner, and the latter's cross-claim against Maher, the stevedore.

On the day of the accident, June 21, 1958, the Bahia De Nipe was tied up at Pier 16, East River, New York City and was receiving cargo from offshore lighters. At the start of loading operations, 8 A.M., if not earlier, a Jacob's ladder had been rigged over the vessel's side for use by stevedores and others in descending to or ascending from a lighter. The ends of the rope uprights of the ladder had been fastened to cleats on the deck of the vessel. When first rigged the bottom rung of the ladder was about a foot above the deck of the lighter to which plaintiff later fell. However, as loading operations progressed, the bottom rungs of the ladder became slack on the deck of the lighter.[17] Calderone had been engaged in the discharge of his duties from 8 A.M. He testified that at about 10 A.M., or shortly thereafter, he was on the deck of the ship preparatory to getting onto the lighter to check, pursuant to orders of the dock boss, a draft of cargo about to be hoisted to the ship; that he then observed a crew member pull up some wooden rungs of the ladder and drape some of them over the top rail; that a section of the ladder—that is, wooden rungs and rope uprights—was slack on the deck of the vessel; that this section was not tied to the rail or secured in any manner.

Calderone, however, did not rest upon his version as to the origin of the ladder's alleged slack condition shortly before its use by him. He called Arrasate, who testified that at about 10 A.M. he was directed by McAllister to move a lighter aft to the No. 2 hatch for delivery of a cargo to the ship; that he looked over from the ship to the lighter where he noticed three or four rungs of the Jacob's ladder slack on the deck and, because it was dangerous to those working there, decided to raise the ladder; that he then pulled up six or eight rungs, piling several on the top rail of the deck of the ship and allowing the balance to fall slack onto the deck; that he then moved the lighter into position, all of which took about ten minutes, following which he left the ship.

The question of who raised the ladder is a close one. Calderone had known Arrasate for several years. Neither upon the trial nor in his pretrial deposition did he say that it was Arrasate whom he observed raise the ladder; on the contrary, he was sure it was an unknown crew member whose weight, height and general features varied considerably from Arrasate's. The depositions of crew members and officers establish quite convincingly that they were engaged in the hold of the vessel from morning until noontime. It is not likely that within a matter of several minutes two men would

---

15. Irwin v. Klein, 271 N.Y. 477, 485–486, 3 N.E.2d 601 (1936). See Rumberger v. Welsh, 131 F.2d 384 (2d Cir. 1942), cert. denied, 319 U.S. 759, 63 S.Ct. 1316, 87 L.Ed. 1711 (1943).

16. Maher's president conceded that if Arrasate shifted the lighter at the direction of McAllister, there would be no question that he was working for Maher.

17. Due to the draft of the ship increasing while that of the lighter decreased.

raise the same ladder. Once the task was done there was no reason for its duplication—indeed, once the Jacob's ladder had been raised and adjusted to eliminate the slack on the lighter's deck, only further unloading and the lapse of a considerable period of time would have brought about the need again to adjust the ladder.

■ Upon all the evidence I am satisfied that it was Arrasate who raised the section of the Jacob's ladder and left a number of rungs slack on the deck of the vessel. While this finding necessarily rejects plaintiff's version of who raised the ladder, it is not altogether clear whether he was merely mistaken or gave wilful false testimony on the subject. In any event, the maxim *falsus in uno, falsus in omnibus* is permissive and not mandatory and does not foreclose consideration of the testimony of another witness on the same subject deemed credible.

I also find that, although the end of the ladder was fastened to cleats on the deck of the ship, the portion which was raised by Arrasate was not made fast to the rail, cleats or padeyes or otherwise properly lashed or secured, but permitted to remain on the deck in slack condition with a lot of rope lying about.

Calderone testified that within five minutes after the Jacob's ladder had been raised, he prepared to go onto the lighter; that he saw slack and lots of rope around; that before getting on the ladder he tugged one of the uprights at the point where it was tied to the cleat; that he was satisfied the ladder was properly secured and would not pay out; that he then climbed over the top rail, stood on the second step of the ladder and while holding on to the top rail jumped up and down and, finding it firm, started to descend next holding on to the lower rail, then on to the coaming of the deck and continued on his way holding on to the ropes of the ladder; that when he had gone down six or seven steps, the ladder suddenly gave way, he was jolted and fell about fifteen feet to the deck of the lighter, sustaining serious injuries. The Court finds that the accident occurred approximately five minutes, but no more than ten, after the ladder had been raised.

We first consider plaintiff's claim that Naviera Vacuba failed in its duty to plaintiff to supply a seaworthy vessel. The ladder was part of the ship's equipment and no claim is made that it was defective. At 8 A.M. it was given by the boatswain to the stevedores, who then rigged it over the side of the ship to the lighter. That it was intended for use by Calderone and others engaged in cargo operations in and about the vessel is not open to challenge.

■ The issue presented is whether the ladder, a section of which was slack on the deck, not secured or lashed to the rail, cleats or padeyes, and intended for use by plaintiff and others engaged in loading operations, was unseaworthy. Such an unsecured ladder, if used, is bound to pay out and in this circumstance it was not reasonably fit for its intended purpose.[18]

The fact that the ends of the rope uprights were fastened to the cleats when the ladder was first rigged does not alter the situation; of necessity an unsecured ladder must give way under the weight of one using it and therefore is not reasonably adequate for its intended use.[19] The

18. "[The Jacob's ladder's] presence over the side with slack unfastened on the deck rendered the [vessel] unseaworthy, and the respondent's liability might well have been predicated on that ground." Pedersen v. United States, 224 F.2d 212, 215 (2d Cir. 1955). Cf. United States Fidelity & Guaranty Co. v. United States, 152 F.2d 46, 48 (2d Cir. 1945). See Lawlor v. Socony-Vacuum Oil Co., 275 F.2d 599 (2d Cir.), cert. denied, 363 U.S. 844, 80 S.Ct. 1614, 4 L.Ed.2d 1728 (1960).

19. Counsel for Maher contends that existence of slack in a ladder for an hour does not render a vessel unseaworthy. He relies upon Ludvigsen v. Commercial Stevedoring Co., 131 F.Supp. 337 (E.D. N.Y.1955), aff'd, 228 F.2d 707 (2d Cir.), cert. denied, 350 U.S. 1014, 76 S.Ct. 660, 100 L.Ed. 874 (1956). However, that

ladder here in question did not afford a reasonably safe means of ingress and egress to and from the lighter.[20] The defendants urge that plaintiff's version that he got to the sixth or seventh step before the ladder gave way is, if in fact the ladder was unsecured, incredible as a matter of law. The explanation given by Arrasate is entirely plausible; that the rungs on the deck might have been caught on the coaming or were resting on one another and so jammed into one another that they gave support until movement caused their displacement.[21] The Court is satisfied that what happened here is that as plaintiff descended with his full weight step by step, plus the accompanying motion away from and toward the vessel, the ladder worked loose and finally paid out.

■ The question remains whether the shipowner, having supplied a seaworthy ladder which was subsequently rendered unseaworthy by the acts of Arrasate, the stevedore's employee, may be held liable. If the doctrine of seaworthiness, as the Supreme Court has repeatedly held in its development beginning with The Osceola[22] and on through Mitchell v. Trawler Racer, Inc.,[23] imposes upon a shipowner an absolute duty to furnish

and to "keep in good order"[24] a seaworthy vessel and appurtenances, then the shipowner is not exonerated from liability even though the stevedore's employee created the unseaworthy condition by his failure to secure an otherwise reasonably safe appliance, in this instance, a Jacob's ladder.

Attempts to engraft exceptions upon the doctrine based on (1) the fact that the unseaworthy equipment had been brought aboard the vessel by stevedores, (2) relinquishment of control, (3) the creation of the unseaworthy condition after the vessel left port, or (4) the transitory nature of the unseaworthy condition, all of which, however stated, rest upon concepts of negligence, have been rebuffed by the Supreme Court.[25] Any lingering doubt that the warranty does in fact impose a "species of liability without fault"[26] was finally put to rest, against vigorous opposition by a minority of the Court, in Mitchell v. Trawler Racer, Inc.[27] The Court there, in emphasizing that due diligence on the part of the shipowner or lack of actual or constructive knowledge of the unseaworthy condition did not insulate him from liability, noted: "[There is] a complete divorcement of unseaworthiness liability from concepts of negligence."[28]

case was decided on a purely factual issue. The district court held against the plaintiff on the principal issue as to the existence of slack. Thus, the district court's statement that if there had been slack lasting an hour it did not render the vessel unseaworthy is dictum. Moreover, with due deference, the cases cited for the dictum do not support this view. The Court of Appeals' affirmance was based on acceptance of the "crucial finding of the trial court" unless clearly erroneous, as required under McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 (1954).

20. Cannella v. Lykes Bros. S.S. Co., 174 F.2d 794 (2d Cir.), cert. denied, 338 U.S. 859, 70 S.Ct. 102, 94 L.Ed. 526 (1949); Vanderlinden v. Lorentzen, 139 F.2d 995 (2d Cir. 1944); Grillo v. Royal Norwegian Government, 139 F.2d 237 (2d Cir. 1943).

21. A similar situation was suggested by Judge Learned Hand in United States

Fidelity & Guaranty Co. v. United States, 152 F.2d 46 (2d Cir. 1945).

22. 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903).

23. 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960).

24. The Osceola, 189 U.S. 158, 175, 23 S.Ct. 483, 47 L.Ed. 760 (1903). See Mahnich v. Southern S.S. Co., 321 U.S. 96, 103–104, 64 S.Ct. 455, 88 L.Ed. 561 (1944).

25. See Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954).

26. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 94, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

27. 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960).

28. Ibid.

The case at bar is not substantially different from Grillea v. United States,[29] where Judge Learned Hand held that the conduct of the plaintiff and his fellow longshoremen,[30] in placing a sound, but the wrong, hatch cover over a padeye rendered the vessel unseaworthy as to the plaintiff longshoreman who was injured when he stepped upon it and it gave way beneath him. Judge Hand wrote:

"It may appear strange that a longshoreman, who has the status of a seaman, should be allowed to recover because of unfitness of the ship arising from his own conduct in whole or in part. However, there is in this nothing inconsistent with the nature of the liability because it is imposed regardless of fault; to the prescribed extent the owner is an insurer, though he may have no means of learning of, or correcting, the defect." [31]

The Supreme Court in Crumady v. The J. H. Fisser [32] cited Grillea with approval, noting that it held "that stevedores themselves could render a ship *pro tanto* unseaworthy and make the vessel owner liable for injuries to one of them."

Our Court of Appeals adhered to and relied upon the Grillea case as authority for its holding in Rich v. Ellerman & Bucknall S. S. Co.,[33] where the unseaworthy condition resulted from improper stowage of truck chassis which did not afford a solid footing to longshoremen working in the hold—a condition created by the stevedores.

"If there was in fact a dangerous working platform endangering longshoremen in plaintiff's situation, which caused plaintiff's injuries, the shipowner was liable regardless of notice and regardless of the fact that the dangerous condition was created by another. The duty to provide a reasonably safe place to work, i. e., a seaworthy vessel reasonably fit in hull, gear and stowage in that respect, is absolute and nondelegable." [34]

There is, in the instant case, no logical basis upon which to distinguish the unseaworthy ladder made so by the stevedore's conduct from the defective block supplied by the stevedores in Alaska Steamship Co. v. Petterson; [35] the hatch cover made dangerous by the act of the stevedores in Grillea; or the chassis made into a dangerous working platform by the stevedores in Rich. Nor is there any rational ground for distinction from Mahnich v. Southern S. S. Co.,[36] where the shipowner was cast in liability when an otherwise safe staging was rendered unseaworthy because the ship's officers negligently used defective rope to rig the staging although sound rope was available.

Here the ladder was rigged in place for use from the start of loading operations; it remained so after it was rendered unseaworthy; it was "as intimately associated with" [37] the vessel as any other portion of it used by plaintiff and others working thereon. The unsecured ladder in fact was "a part of the [ship] for continued prosecution of the work * * *" [38] more so than the tilted chassis in Rich and the misplaced hatch cover

29. 232 F.2d 919 (2d Cir. 1956).

30. On reargument the Court noted that plaintiff himself was not responsible for misplacing the hatch and held that this not only was immaterial but in fact confirmed the original holding. Id. at 925.

31. 232 F.2d at 923.

32. 358 U.S. 423, 427, 79 S.Ct. 445, 3 L. Ed.2d 413 (1959).

33. 278 F.2d 704 (2d Cir. 1960).

34. 278 F.2d at 707.

35. 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954).

36. 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944).

37. Mahnich v. Southern S.S. Co., 321 U.S. 96, 104, 64 S.Ct. 455, 88 L.Ed. 561 (1944).

38. Grillea v. United States, 232 F.2d 919, 923 (2d Cir. 1956). See also, Carabellese v. Naviera Aznar, S.A., 285 F.2d 355, 359 (2d Cir. 1960), cert. denied, 365 U.S. 872, 81 S.Ct. 907, 5 L.Ed.2d 862 (1961),

in Grillea. The duty of the shipowner did not end when it supplied a seaworthy ladder to the stevedore; its nondelegable duty was to maintain and keep it seaworthy.

The conclusion is compelled under the teachings of Sieracki, Crumady and Mitchell in the Supreme Court, and the controlling authority in this Circuit [39] of Grillea and Rich that when the vessel was rendered *pro tanto* unseaworthy because of the unsecured ladder, the shipowner was not relieved of liability, even though without fault and notwithstanding that the unseaworthy condition which led to plaintiff's injuries was created by Arrasate, the stevedore's employee. Indeed, the instant case stands on even stronger footing than Grillea since here plaintiff himself did not bring into play the unseaworthy condition.[40]

This disposition makes it unnecessary to consider plaintiff's claim of negligence based on the shipowner's alleged breach of its independent duty to the plaintiff as an invitee to exercise reasonable care to provide a safe ladder as a means of ingress and egress to and from the lighter.[41]

The question remains as to damages.

Plaintiff was rendered unconscious as a result of the fall. He was hospitalized for approximately seven weeks, following which he was an outpatient over a period of ten or eleven months and was required to wear an orthopedic support. He did not return to work until September 1959.

Plaintiff sustained compression fractures of two lumber vertebrae which, at the time of the trial, were completely healed. The medical experts disagreed as to whether there was some subluxation of other vertebrae; the Court finds there was none. Except for occasional pain and headaches which may continue for an indefinite period, the Court finds that there is no permanency of injury; further, that plaintiff can and has been able for some time to resume his previous work, although he claims he can act as a checker only on shoreside operations because of inability to climb ladders, with consequent loss of overtime obtainable on ship work. There has been some diminution of his income since his return to work, but this has been due principally to the fact that he worked at a pier which serviced Cuban vessels which no longer come to our ports.

The hospital and medical bills total $1,440. Plaintiff, prior to the accident, was earning $7,000 per year. He was out of employment for about fourteen months, incurring a wage loss of $8,160. Thus, the special damages amount to approximately $9,600. The Court deems a reasonable sum for pain and suffering, past and future, the nature and extent of injuries, and all other compensable elements of damage, to be in the amount of $12,500 which, when added to the special damages, brings the total to $22,100. However, this is subject to reduction if the defendant has carried its burden on the issue of contributory negligence.

and Judge Chesnut's analysis of the basis upon which liability is imposed in Wyborski v. Bristol City Line of Steamships, Ltd., 191 F.Supp. 884, 892 (D.Md.1961).

39. But see Billeci v. United States, 298 F. 2d 703, 706 & n. 10 (9th Cir. 1962); Blankenship v. Ellerman's Wilson Line New York, Inc., 265 F.2d 455, 457 (4th Cir. 1959); Imperial Oil, Ltd. v. Drlik, 234 F.2d 4, 8 (6th Cir.), cert. denied, 352 U.S. 941, 77 S.Ct. 261, 1 L.Ed.2d 236 (1956); Brabazon v. Belships Co., 202 F.2d 904, 908 (3d Cir. 1953). The Third Circuit, however, appears to have restricted the effect of Brabazon in Knox v. United States Lines Co., 294 F.2d 354, 359 (3d Cir. 1961).

40. Compare Alexander v. Meiji Kaiun K.K., 195 F.Supp. 831 (E.D.La.1961); Morris v. Blue Star Lines, 193 F.Supp. 763 (D.Or.1961); Holley v. The Manfred Stansfield, 186 F.Supp. 212 (E.D.Va. 1960); Di Salvo v. Cunard Steamship Co., 171 F.Supp. 813 (S.D.N.Y.1959).

41. Vanderlinden v. Lorentzen, 139 F.2d 995, 997 (2d Cir. 1944); Grillo v. Royal Norwegian Government, 139 F.2d 237, 238 (2d Cir. 1943). See Pedersen v. United States, 224 F.2d 212, 215 (2d Cir. 1955).

The plaintiff saw the ladder raised and slack on the deck with a lot of rope around. He observed that the ladder was not tied to the rails or padeyes. He tested by tugging at that part of an upright which had been fastened closest to the cleat—at that examining only one of the uprights, and by putting his weight upon one step and then another as he proceeded on his way. He neither examined nor tested the slack itself to see if it was tied to the rail or otherwise secured, although he knew that excess slack should be made fast to the rib of the rails, cleats or padeyes. Under these circumstances, fully aware of all the facts, the testing by pulling at the ends of the uprights and by his weight upon the steps while holding on to the top rail was not sufficient.[42] Plaintiff just assumed that the rope which was strewn on the deck in fact secured the slack and, by his own admission, did not trace this excess rope to verify his assumption. The only rope he traced was that which was tied to the cleat. Apart from the foregoing, plaintiff admitted upon his pretrial deposition that before he got on the ladder he did not check at all. There was no immediate dangerous situation confronting him as was the case in Pedersen v. United States,[43] which led the Court to exonerate the plaintiff from a charge of contributory negligence.

Under all the circumstances, plaintiff was as much responsible for the accident as the defendant. Accordingly, the total amount of damages is reduced by fifty per cent[44] and he is entitled to a judgment in his favor against Naviera Vacuba in the sum of $11,050.

The final question is the cross-claim by Naviera Vacuba against Maher, the stevedore. Apart from Maher's obligation to carry on the stevedoring operation in a workmanlike manner,[45] it was also under a separate and nondelegable duty to Calderone, its employee, to furnish him a reasonably safe means of access to and from the vessel to the lighter.[46] Arrasate created the condition which at once violated each of these independent obligations. As already held, Arrasate was the employee of Maher and accordingly the latter is accountable to Naviera Vacuba for his negligent conduct which cast the shipowner in liability to the plaintiff in the sum of $11,050. In addition to indemnification for that amount, the shipowner requests counsel fees and reimbursement of expenses[47] incurred in the defense of the action, which a senior partner of the law firm representing the shipowner testified were in the range of $6,000 to $7,000. This estimate, however, also encompassed the admiralty suit by plaintiff against Garcia and Diaz. I find upon all the evidence that the fair and reasonable sum for the defense of the civil action by plaintiff against the shipowner is $3,500, inclusive of allowable disbursements. I have not allowed item-by-item disbursements because in the Court's view some of these are excessive or not permissible and, while per-

42. Mason v. United States, 177 F.2d 352 (2d Cir. 1949).

43. 224 F.2d 212, 215 (2d Cir. 1955).

44. Cf. Nygren v. American Boat Cartage, Inc., 290 F.2d 547 (2d Cir. 1961).

45. Crumady v. The J. H. Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); Rich v. United States, 177 F.2d 688, 691 (2d Cir. 1949).

46. Vanderlinden v. Lorentzen, 139 F.2d 995, 997 (2d Cir. 1944); Grillo v. Royal Norwegian Government, 139 F.2d 237 (2d Cir. 1943). The fact that an employee's remedy in the event of a breach is limited to compensation payments under statute, 33 U.S.C.A. § 905, does not negate the basic duty of the employer to furnish his employees with a reasonably safe place in which to work. Cf. McFall v. Compagnie Maritime Belge, 304 N.Y. 314, 107 N.E.2d 463 (1952).

47. Paliaga v. Luckenbach S.S. Co., 301 F.2d 403 (2d Cir. 1962); Shannon v. United States, 235 F.2d 457 (2d Cir. 1956).

haps acceptable to a client, are not chargeable to an opposing party.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law. Judgment may be entered accordingly.