Frank GIARAFFA, Plaintiff,

v.

MOORE–McCORMACK LINES, INC., and the SS MORMACBAY, her boilers, engines, etc., Defendant and Third-Party Plaintiff,

v.

ATLANTIC COAST INDUSTRIES CORPORATION, Third-Party Defendant.

No. 64 A 1224.

United States District Court
S. D. New York.

June 27, 1967.

Goldstein & Sterenfeld, New York City, by Herbert W. Sterenfeld and Bryan Levinson, New York City, of counsel, for plaintiff.

Browne, Hyde & Dickerson, New York City, by John H. Reilly and W. Mahlon

Dickerson, New York City, of counsel, for Moore-McCormack.

Purdy, Lamb & Cattogio, New York City, by Edmund F. Lamb, New York City, of counsel, for Atlantic Coast.

EDELSTEIN, District Judge.

OPINION

This admiralty action arose out of a fall suffered by plaintiff, Frank Giaraffa, a ship cleaner, on June 13, 1963, aboard the SS MORMACBAY. Defendant, Moore-McCormack Lines, Inc., was the owner of the SS MORMACBAY. The third-party defendant, Atlantic Coast Industries Corporation was Giaraffa's employer. The jurisdiction of this court was invoked under the general admiralty and maritime jurisdiction, 28 U.S.C. § 1333.

Frank Giaraffa, thirty years old, and employed as a ship cleaner by Atlantic Coast Industries Corporation, reported to work at the Moore-McCormack Pier 23, Brooklyn, New York, at 7:30 a. m. on June 13, 1963. Giaraffa, his foreman, Jack Mateo, and part of his work gang were assigned by Anthony Cosentino, the Moore-McCormack maintenance supervisor, to work aboard the SS MORMACBAY cleaning the No. 5 lower hold. Mateo did not testify at trial and his deposition was never taken by any of the parties. The work gang went on board the SS MORMACBAY at 8:00 a. m. Giaraffa testified that he carried on board the MORMACBAY a two-piece aluminum extension ladder, weighing 25 to 35 lbs., each section being between 12 and 16 feet in length. He added that the base of the ladder had worn edges and no safety shoes, and he recalled having taken it from a truck belonging to Atlantic Coast Industries earlier that morning. The deposition of Sven Johnson, the Moore-McCormack port captain, was partially read into evidence at the trial. Johnson deposed that he did not remember whether or not the ladder had safety shoes. He stated that he asked the Atlantic Coast men to save the ladder but the ladder was not introduced at the trial.

Cosentino testified that the ladder had safety shoes, but he based his testimony upon a fleeting observation from the deck down into a hatch, a distance of approximately 35 feet. His description of the safety shoes was vague and vacillating and was elicited from him with great difficulty. Nor is it without some significance that he did not examine the ladder after the accident. Giaraffa's testimony as to the absence of safety shoes must prevail over Cosentino's since it was clear and based upon first-hand use of the ladder. Although Cosentino testified that the ladder was delivered to him that morning by Atlantic Coast, Theodore Carras, President of Atlantic Coast, testified to the contrary. The preponderance of the credible evidence leads to the conclusion that the ladder was delivered by Atlantic Coast to Moore-McCormack on June 13, 1963. Frank Giaraffa testified to the same effect, and on this point, which only affects the indemnity issue in this case, he is a disinterested witness.

Jack Mateo, the Atlantic Coast foreman, assigned Giaraffa to clean the overhead beams in the No. 5 hatch on the MORMACBAY. The extension ladder was used, with Giaraffa climbing and cleaning and another man holding the ladder. This job continued until the lunch hour break at noon. After returning from lunch at one o'clock, Mateo, Giaraffa and a third man continued to work in the No. 5 hatch.

Shortly before 1:30 p. m., Capt. Johnson, Cosentino's superior in the Moore-McCormack chain of command, instructed him to have the coamings and gutters of the aft starboard and port deep tanks in the No. 2 hatch cleaned. This job was to be completed by 5:00 p. m. on the same day. Cosentino went to the No. 5 hatch and called down to Mateo to send Frankie up. Giaraffa climbed out of the No. 5 hatch and met Cosentino at the No. 2 hatch where Cosentino explained what Giaraffa was to do. He then told Giaraffa to get the ladder from the No. 5 hatch. Giaraffa went back to the No. 5 hatch where Mateo was still working. He told

Mateo that he needed the ladder for a job in the No. 2 hatch. Mateo asked him whom he was taking to assist him and Giaraffa said no one. Giaraffa threw a line down to Mateo in the No. 5 hatch and Mateo tied onto it the ladder and the cleaning gear Giaraffa needed. Giaraffa then pulled up the ladder and his gear and took them to the No. 2 hatch.

When Giaraffa arrived at the No. 2 hatch, he began his task with the aft starboard deep tank. The floor of the deep tank was made of steel. He placed the ladder with one end on the floor and the other end balanced underneath the hatch cover hinge. He proceeded to test the ladder by standing on the lower rungs and shaking the ladder. He did not lash the ladder. He then climbed up the ladder and cleaned part of the gutter. Using the same climbing procedure two more times, he was able to clean one side of the coaming. He cleaned the other three sides of the coaming from the top of the deep tank without the need of the ladder. It was then approximately 2:45 p. m., and Giaraffa had one more deep tank coaming to clean. He lowered the ladder and his gear into the aft port deep tank and set his ladder against the hinge of the hatch cover. He again tested the ladder by standing on the lower rungs and shaking it. He then climbed up the ladder and began to clean. The ladder slipped from under him and he fell, sustaining serious injury.

■ Frank Giaraffa's claim of negligence and unseaworthiness is based upon two points—that the work he was performing needed more than one employee, and that the ladder was unsafe in that it had no safety shoes. Giaraffa testified that he asked Cosentino for an anchor man to hold the ladder but Cosentino testified that no such request was ever made. In any event, no anchor man was provided. It is not disputed that good safety practice required either that an anchor man be provided or that a portable ladder be lashed when in use. Whereas Cosentino testified that there were numerous places where the ladder could have been lashed, Giaraffa testi-fied that he was not aware of any such place. It is undisputed that there were no pad eyes for lashing in the deep tank and that Cosentino did not indicate any alternative lashing places to Giaraf-fa. A ship owner owes a business guest or other invited person a safe place to work. United New York & New Jersey Sandy Hook Pilots Assn. v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959); The M/V Tungus v. Skov-gaard, 358 U.S. 588, 79 S.Ct. 503, 3 L.Ed.2d 524 (1959); Connolly v. Weyerhaeuser Steamship Co., 236 F.2d 848 (2d Cir. 1956), rev'd on other ground sub nom. Weyerhaeuser Steam-ship Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958). Moore-McCormack breached its duty to Giaraffa, who as a ship cleaner fell within the protected class, when Cosentino sent Giaraffa to work alone in the deep tank. Since Giaraffa was given no anchor man, the deep tank was not a safe place to work. Although the consequence might have been avoided if Cosentino had told Giaraffa where to lash the ladder, he failed to do so.

■ The MORMACBAY was un-seaworthy in respect to Frank Giaraffa. A ship owner's warranty of seaworthi-ness runs in favor of one who is performing the ship's service. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). Frank Giaraffa, a ship cleaner, was performing the ship's service and was thus entitled to a seaworthy vessel. He did not get one. "[T]he concept of seaworthiness * * * contemplates that a ship's hull, gear, appliances, ways, appurtenances and manning will be reasonably fit for its intended purpose." NORRIS, Mari-time Personal Injuries § 27 at p. 63 (1959). See also Amador v. A/S J. Ludwig Mowinckels Rederi, 224 F.2d 437, 440 (2d Cir.) cert. denied 350 U.S. 901, 76 S.Ct. 179, 100 L.Ed. 791 (1955). The ladder used by Giaraffa was not fit for its intended purpose. The ladder had no safety shoes. This defect ren-dered use of the ladder extremely haz-ardous. Even if the ladder had safety

shoes, it would still not have been fit for its intended purpose since it was not secured. An unsecured ladder has previously been held to have rendered a vessel unseaworthy. See Reid v. Quebec Paper Sales & Transp. Co., 340 F.2d 34 (2d Cir. 1965). The fact that Atlantic Coast supplied the ladder is irrelevant. See Petterson v. Alaska S.S. Co., 205 F.2d 478 (9th Cir. 1953), aff'd 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954). The ladder was not secured in that it was neither lashed into a fixed position nor held firmly in place by an anchor man. The failure to provide an anchor man to secure the ladder rendered the MORMACBAY unseaworthy on an additional ground. On May 8, 1967, the Supreme Court faced the following question: "[W]hether a vessel is unseaworthy when its officers assign too few crewmen to perform a particular task in a safe and prudent manner." Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482. The court answered Yes. In the case at hand, since Giaraffa was not shown where and how to lash the ladder, which was already less than properly fit since it had no safety shoes, an anchor man was needed to secure it. One was not provided. Too few men were thus assigned the task of cleaning the deep tank and the vessel was unseaworthy.

The failure to provide a safe, secure ladder for which Moore-McCormack is accountable both in negligence and unseaworthiness, was the proximate cause of Giaraffa's fall. When the unsecured ladder came down, Giaraffa came down, and his injuries arose.

 Moore-McCormack and Atlantic Coast both argued that the accident was caused solely by Frank Giaraffa's contributory negligence. Giaraffa testified that when the ladder slipped out from under him he was able to hold on to the edge of the coaming for a few seconds before he fell. He further testified that during the course of his fall he jackknifed or somersaulted so that he landed in such manner as to strike first his arms, then his leg, and then his face, on the floor of the tank. Atlantic Coast claimed that this feat is a physical impossibility. Atlantic Coast merely conjectured that Giaraffa must have leaned too far on the ladder in order to fall and strike the deck in the sequence claimed. The burden of showing that Frank Giaraffa was contributorily negligent was on defendant and third-party defendant. Gypsum Carrier, Inc. v. Handelsman, 307 F.2d 525, 528, 4 A.L.R.3d 517 (9th Cir. 1962); United States v. Smith, 220 F.2d 548, 554 (5th Cir. 1955); 2 Norris Seamen § 684 at p. 847 (1962). Third-party defendant has failed to meet this burden by a preponderance of the credible evidence on the question of how Giaraffa fell from the ladder. The main claim of contributory negligence arises out of Giaraffa's failure to lash the ladder. Giaraffa was an experienced ladder man who knew that when no anchor man was available a portable ladder should be lashed. Cosentino testified that there were numerous places to which the ladder could have been lashed, but he added that he never indicated this to Giaraffa. Time was of the essence in the cleaning operation since the ship was to be moved that evening. There were no pad eyes in the deep tank and Giaraffa testified that it was improper to lash to any moving parts. Giaraffa, in the use of due care and ordinary prudence, could hardly have been expected to make a leisurely inspection of the surrounding area to see if there were any possibility of lashing. For Giaraffa to have been guilty of contributory negligence it must have been shown by a preponderance of the credible evidence that he was aware of places where lashing could have been accomplished in the area of the deep tank and, in disregard of this knowledge, he failed to lash. See Smith v. United States, 336 F.2d 165, 168 (4th Cir. 1964); Nicroli v. Den Norske Afrika-Og Australielinie Wilhelmsens Dampskibs-Aktieselskab, 332 F.2d 651, 654 (2d Cir. 1964). Such a showing has not been made.

Frank Giaraffa was seriously injured as a result of his fall. He was removed from the deep tank by means of a stretcher basket attached to a boom and then taken by ambulance to the Lutheran Medical Center. At the hospital Giaraffa came under the care of Dr. John L. Paladino, an associate surgeon on the staff of Lutheran Hospital. Dr. Paladino's initial diagnosis was that Giaraffa suffered comminuted fractures of the right and left wrist, a laceration of the left eye with ecchymosis of the left eye, a contusion of the left knee and a fracture of the left patella. Dr. Paladino first treated Giaraffa for shock. He then had Giaraffa brought into the operating room so that he could reduce the fractures of the wrists. Casts were then placed on the wrists. On June 19, 1963, Dr. Paladino re-reduced the fracture of the left wrist and applied new casts to both wrists. The fracture of the left patella was treated by bed rest. Giaraffa was given Demerol for his pain during his stay in the hospital. He was discharged from the hospital on June 27, 1963. After his discharge, he was examined twice a week at Dr. Paladino's office. This continued until August 7, 1963, when Dr. Paladino removed the casts on both wrists. Giaraffa, complaining of severe pain in his arms and wrists and weakness of grasp in both hands, continued to see Dr. Paladino for heat and physiotherapy treatments for a period of two or three months. Dr. Paladino then referred him to Mrs. Samuelson for physical therapy. Giaraffa did not attend the sessions with Mrs. Samuelson with great regularity. Giaraffa was also treated, at least on one occasion, by Dr. Feuer, a physician who does physiotherapy. Finally, Giaraffa was referred to Dr. Melvin C. Goldberg, a specialist in physical medicine and rehabilitation. Dr. Goldberg had previously examined Giaraffa on October 22, 1963, on behalf of the compensation carrier. Dr. Goldberg was selected to be Giaraffa's physiotherapist by the compensation carrier. He treated Giaraffa from May 12, 1964, through May 31, 1966, but Giaraffa did not attend these sessions with great regularity.

Dr. Paladino and Dr. Goldberg testified on behalf of Giaraffa at the trial. Dr. Sidney Stephen Gaynor, an orthopedic surgeon, testified as an expert witness on behalf of Moore-McCormack. Dr. Gaynor had examined Giaraffa only on April 21, 1966. Both Dr. Paladino and Dr. Goldberg testified that Giaraffa had severe restrictions of motion in both his wrists and weakness of grip in both hands. Dr. Gaynor, on the other hand, found only mild restriction of motion. He further stated that gripping power could not be objectively determined. Dr. Paladino and Dr. Goldberg both stated that gripping power could be determined objectively, not precisely, but to some degree. Dr. Paladino made a clinical finding of traumatic arthritis in both wrists. Dr. Gaynor confirmed the existence of traumatic osteo-arthritis in both wrists. Dr. Gaynor stated that this osteo-arthritis is probably one of the reasons that Giaraffa has a restriction of motion and that it causes pain. Giaraffa testified that he still has great pain in his wrists. The three doctors agreed that the residuals of the injury to Giaraffa's wrists were permanent and not improvable. Giaraffa still complains of pain in his left knee, but neither Dr. Paladino nor Dr. Goldberg could find anything objectively to support this complaint.

An examination of the hospital records and a consideration of Dr. Paladino's testimony impels to the conclusion that Frank Giaraffa suffered comminuted fractures of both wrists, a laceration of the left eye with ecchymosis, a contusion of the left knee and a fracture of the left patella as a result of his fall aboard the MORMACBAY. An examination of the testimony of Dr. Paladino, the treating surgeon at Lutheran Medical Center, the testimony of Dr. Goldberg, the treating physiotherapist chosen by the compensation carrier, the testimony of Dr. Gaynor, an expert witness called by the defendant who examined the plaintiff only once, and the

testimony of Frank Giaraffa brings forth the conclusion that Frank Giaraffa still suffers from severe restrictions in motion of both wrists, pain in both wrists, and weakness of grip in both hands, and that these conditions are permanent and irreversible. The impairments that Frank Giaraffa has at present are the residual effects of the injuries he sustained when he fell. Dr. Paladino's testimony that Giaraffa's original injuries were proximately caused by his fall stands uncontradicted.

■ The occupation of ship cleaner demands that a person thus employed have good, strong wrists and a firm grasp. The job entails the climbing of ladders, manual dexterity and strength. From Frank Giaraffa's enumeration of the various jobs held by him during his working years, it is clear that he was a laborer with no true skills. Both Dr. Paladino and Dr. Goldberg testified that he could never again work as a laborer or ship cleaner. Although Dr. Gaynor disagreed with their common conclusion, it must be remembered that he was of the opinion that Giaraffa's gripping ability was in no way impaired, an opinion which the court does not share. It is true enough that there is an innumerable range of occupations that Giaraffa, despite his impairments, could possibly pursue. But to speculate as to the probability and possibility of his obtaining any such position is to engage in an exercise so conjectural and unrewarding as to be indeed an exercise in futility. A candid consideration of Giaraffa's disabilities together with his background, training, education, previous working experience and condition in life unfailingly leads to the conclusion that Giaraffa is unemployable for all practical purposes. While he was employable, his earnings varied greatly. The disparity in his earnings, however, can be ascribed to circumstances unrelated to this case. On two separate occasions he was unable to work at all. This accounted for a total of four years of unemployment, and on a third occasion he was restricted to light work for two years. Furthermore, he was unable to join a union until January 1963, when he finally managed to become a member of the International Longshoremen's Association. Thereafter he was able to obtain employment with Atlantic Coast. All of the circumstances concerning Giaraffa's earnings at and prior to the time of his accident justify the acceptance of $100.00 a week as the amount upon which damages for lost earnings are to be computed. Giaraffa has not been able to work since the date of his accident, as a result of which he has lost $17,500.00 in past wages. The present value of his future loss of earnings based on his work life expectancy of 31 years and 4 months equals $89,000.00. His expenses for hospitalization and medical treatment have been stipulated at $2303.25. It has also been stipulated that at the time of his injury Giaraffa had a life expectancy of forty-two years. The remainder of his life will be filled with pain and suffering. Giaraffa suffered excruciating physical pain immediately following the accident, he has physical pain now, and will have physical pain during all the years of his life. Also to be borne in mind is the mental anguish one must feel knowing that one can no longer be the active and self-sufficient member of society that one once was. Damages for past and future pain and suffering are assessed at $50,000.00.

■ Moore-McCormack has argued that if it is held liable to Frank Giaraffa it is entitled to be indemnified by Atlantic Coast either on an express contract of indemnification or under an implied agreement. The only evidence of note offered in support of Moore-McCormack's express contract indemnification claim is contained in an answer to an interrogatory by Atlantic Coast to the effect that Atlantic Coast had been engaged by Moore-McCormack to perform work aboard the SS MORMAC-BAY and that the work was performed by Atlantic Coast pursuant to Contract No. C–MM 111. "Answers to interrogatories clearly may be utilized as admis-

sions." Gadaleta v. Nederlandsch-Amerekaansche Stoomvart, 291 F.2d 212, 213 (2d Cir. 1961). See also Ohio Valley Elec. Corp. v. General Elec. Co., 244 F.Supp. 914, 954 (S.D.N.Y.1965). In Iravani Mottaghi v. Barkey Importing Co., 244 F.2d 238 (2d Cir.) cert. denied 354 U.S. 939, 77 S.Ct. 1402, 1 L.Ed.2d 1538 (1957) the court, in denying a petition for rehearing wrote:

> "Admittedly, it is very unusual to treat the admission of a party as less than conclusive, but we see no reason why this should not be done as a matter of discretion in the extraordinary circumstance where justice requires it." Id. at 260.

In that case, however, the admission referred to was a judicial admission made by the plaintiff while he was on the witness stand. The Second Circuit had previously said:

> "An admission, except when formally made at trial, even if by a party in propria persona, is at most only evidentiary matter which may be rendered nugatory by other evidence in the case." Ira S. Bushey & Sons v. W. E. Hedger & Co., 40 F.2d 417, 418 (2d Cir. 1930).

Atlantic Coast has cavalierly and gratuitously attempted to explain the admission as a result of "carelessly prepared and erroneous answers to interrogatories." Although this is far from a satisfactory explanation the evidentiary value of the admission nevertheless was rendered nugatory by countervailing evidence. The wording of the contract itself and the testimony of Anthony Cosentino and Theodore Carras demonstrated that the contract did not include the type of work which Frank Giaraffa was performing prior to and at the time of his accident. Various bills submitted by Atlantic Coast further strengthen this conclusion since the work performed by Atlantic Coast for Moore-McCormack at the time of the accident was not charged according to the contract schedule of charges and was tabulated in a manner different from the manner specified in the contract. The only portion of the contract indicated by the defendant as covering the work done by Giaraffa is Specification 26:

> "The contractor is to give his commercial rates for labor that will apply for work not heretofore specified which will be carried out on a labor time basis.
>
> "(A) GENERAL MAINTENANCE to cover the following work:
>
> "1. Life boats
>
> "2. All deck, engine, and stewards cleaning, and assistance to the crew."

Although the time labor basis is consistent with the billing procedure used in the bills submitted in the case at hand, it is clear, however, that Giaraffa was engaged in work other than that enumerated in Specification 26.

■ Turning now to Moore-McCormack's second argument, the court is of the opinion that Moore-McCormack can recover under an implied agreement. See NORRIS, Maritime Personal Injuries §§ 49–61 (1959). Atlantic Coast breached its warranty of workmanlike service which ran in favor of Moore-McCormack. Not only did Atlantic Coast provide a defective ladder, but its foreman, Jack Mateo, did not even attempt in the slightest degree to look after Giaraffa's safety. Mateo was fully aware that Giaraffa was going alone with a defective ladder to work in No. 2 hold yet he made no effort to ascertain the conditions under which Giaraffa would be required to work. Neither did he undertake to provide him with an anchor man, nor instruct him to lash the ladder. Mateo showed a complete and utter disregard for the welfare of his workman, Giaraffa. A foreman cannot simply abdicate from his supervisory responsibility by inaction. Workmanlike service includes adequate supervision and direction of subordinate personnel. Had Atlantic Coast not supplied a defective ladder and failed to adequately supervise its men, the accident would not have occurred. Atlantic Coast breached its warranty, and, hence, Moore-McCor-

mack is entitled to indemnity. Such indemnity includes the reasonable value of counsel fees. Norris, Maritime Personal Injuries § 61 (1959).

 Atlantic Coast has argued that Moore-McCormack is not entitled to indemnification for two reasons. The first is that under the doctrine of Weyerhaeuser Steamship Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958), Moore-McCormack was guilty of conduct sufficient to preclude indemnity. Even though Moore-McCormack's conduct by Cosentino constituted negligence and created a condition of unseaworthiness, it nevertheless was not guilty of conduct sufficient to preclude indemnity since it in no way interfered with Atlantic Coast's supervision and direction of its personnel under Atlantic Coast's warranty of workmanlike service.

 The second reason urged by Atlantic as a bar to indemnification is that Giaraffa became the ad hoc employee of Moore-McCormack. To be sure, Giaraffa went to work in No. 2 hold at the behest of Cosentino and pursuant to his directions, but one employing an independent contractor may always say what is to be done. The relationship between Mateo, Giaraffa and Cosentino previously discussed makes it abundantly clear that Giaraffa was not a borrowed servant. Suffice it to say that the court concludes on all the evidence that Giaraffa worked under and was subject to the direction, control, and orders of Atlantic Coast's foreman, Jack Mateo. See Calderone v. Naviera Vacuba S/A, 204 F.Supp. 783, 788 (S.D.N.Y.1962), aff'd, 325 F.2d 76 (2d Cir. 1963); Irwin v. Klein, 271 N.Y. 477, 3 N.E.2d 601 (1936). The cases cited by Atlantic Coast in support of its contention are either inapposite or distinguishable. Giaraffa was not the ad hoc employee of Moore-McCormack.

## FINDINGS OF FACT

1. On June 13, 1963, Frank Giaraffa, the plaintiff, thirty years old, a ship cleaner, reported for work at 7:30 a. m. at Pier 23, Brooklyn, New York.

2. Moore-McCormack Lines, Inc., the defendant, was the owner of the SS MORMACBAY.

3. Atlantic Coast Industries Corp., the third-party defendant, was Giaraffa's employer.

4. Jack Mateo, an Atlantic Coast employee, was Giaraffa's foreman.

5. Anthony Cosentino was the Moore-McCormack maintenance supervisor.

6. Cosentino assigned Mateo's gang to work aboard the SS MORMACBAY cleaning the No. 5 lower hold.

7. The work gang went on board the SS MORMACBAY at 8:00 a. m.

8. Frank Giaraffa took a two-piece aluminum extension ladder, weighing 25–35 lbs., each section being between 12 and 16 feet in length, from an Atlantic Coast truck and carried it aboard the MORMACBAY. The base of this ladder had worn edges and no safety shoes.

9. Jack Mateo assigned Giaraffa to clean the overhead beams in the No. 5 hatch.

10. The extension ladder was used, with Giaraffa climbing and cleaning and another man holding the ladder.

11. This job continued until the lunch hour break at noon.

12. After returning from lunch at 1:00 o'clock, Mateo, Giaraffa, and a third man continued to work in the No. 5 hatch.

13. Shortly before 1:30 p. m., Capt. Johnson, the Moore-McCormack port captain, and Cosentino's superior, instructed Cosentino to have the coamings and gutters of the aft starboard and port deep tanks in the No. 2 hatch cleaned.

14. This job was to be completed by 5:00 p. m.

15. Cosentino went to the No. 5 hatch and called down to Mateo to send Giaraffa up.

16. Giaraffa climbed out of the No. 5 hatch and met Cosentino at the No. 2 hatch where he was told what to do.

17. Giaraffa went back to the No. 5 hatch to get the ladder.

18. Giaraffa told Mateo that he needed the ladder for a job in the No. 2 hatch.

19. Mateo was informed by Giaraffa that he was to do the job alone.

20. Mateo gave Giaraffa no instructions.

21. Mateo did not undertake to ascertain under what conditions Giaraffa was to work.

22. Mateo did not undertake to provide Giaraffa with an anchor man.

23. Giaraffa went to the No. 2 hatch where he began cleaning the aft starboard deep tank.

24. The floor of the deep tank was made of steel.

25. Giaraffa placed the ladder with one end on the floor and the other end balanced underneath the hatch cover hinge.

26. He proceeded to test the ladder by standing on the lower rung and shaking the ladder.

27. He did not lash the ladder.

28. After cleaning the aft starboard deep tank, Giaraffa began to work in the aft port deep tank.

29. He again tested the ladder by standing on the lower rung and shaking the ladder.

30. Again he did not lash the ladder.

31. He was unaware of any place to which to lash the ladder.

32. There were no pad eyes in the deep tank.

33. The ladder slipped out from under Giaraffa and he fell, sustaining serious injuries.

34. The ladder slipped because there were no safety shoes on the base of the ladder and no anchor man was provided and the ladder was not lashed.

35. Moore-McCormack owed Giaraffa a safe place to work.

36. Giaraffa was not given a safe place to work.

37. The ladder used by Giaraffa was not fit for its intended purpose in that it had no safety shoes.

38. This defect was not compensated for by the use of an anchor man or a securing of the ladder.

39. The failure to provide a safe, secure ladder was the proximate cause of Giaraffa's fall.

40. Giaraffa was removed from the deep tank by means of a stretcher basket attached to the ship's boom and then taken by ambulance to the Lutheran Medical Center.

41. At the hospital, Giaraffa came under the care of Dr. John L. Paladino.

42. Giaraffa had suffered comminuted fractures of the right and left wrists, a laceration of the left eye with ecchymosis of the left eye, a contusion of the left knee and a fracture of the left patella.

43. Giaraffa was first treated for shock.

44. Dr. Paladino then reduced the fractures in both of Giaraffa's wrists.

45. Casts were then placed on Giaraffa's wrists.

46. On June 19, 1963, Dr. Paladino re-reduced the fracture of the left wrist and applied new casts to both wrists.

47. The fracture of the left patella was treated by bed rest.

48. Giaraffa was given Demerol for his pain during his stay in the hospital.

49. He was discharged from the hospital on June 27, 1963.

50. He continued to see Dr. Paladino at his office twice a week until August 7, 1963, when the casts were removed.

51. Giaraffa continued to see Dr. Paladino for heat and physiotherapy treatments for a period of two or three months.

52. Giaraffa then saw Mrs. Samuelson for physical therapy at irregular intervals.

53. Giaraffa was also treated, at least on one occasion, by Dr. Feuer, a physician who specializes in physiotherapy.

54. Giaraffa was then referred to Dr. Melvin C. Goldberg, a specialist in physical medicine and rehabilitation, chosen by the compensation carrier, who treated Giaraffa from May 12, 1964, through May 31, 1966.

55. Giaraffa still has pain in his wrists.

56. Giaraffa has a weakness of grip in both hands.

57. He also has severe restriction of motion in both his wrists.

58. He suffers from traumatic osteoarthritis in both his wrists.

59. His disabilities are permanent and not improvable.

60. These disabilities are the residual effects of the injuries he suffered upon his fall.

61. Frank Giaraffa is totally and permanently disabled.

62. One hundred dollars ($100.00) a week is a fair and reasonable figure for computing Giaraffa's lost earnings.

63. Giaraffa has been unable to work since his accident.

64. Giaraffa has lost $17,500.00 in past wages.

65. Giaraffa had a working life expectancy of 31 years and 4 months.

66. Giaraffa's medical expenses for hospitalization and medical treatment were $2,303.25.

67. At the time of his injury Giaraffa had a life expectancy of 42 years.

68. He will suffer pain and be disabled for the rest of his life.

69. A certain contract, styled C–MM 111, dated December 30, 1952, between Moore-McCormack and Atlantic Coast in no way applies to this case.

70. Jack Mateo did not discharge his supervisory duty in regard to Giaraffa's safety.

71. Atlantic Coast breached its warranty of workmanlike service to Moore-McCormack.

72. Moore-McCormack was not guilty of conduct sufficient to preclude indemnity.

73. Giaraffa remained under the direction and the control of Atlantic Coast's foreman.

74. Giaraffa did not become the ad hoc employee of Moore-McCormack.

CONCLUSIONS OF LAW

1. This court has jurisdiction over the matter in question.

2. Moore-McCormack was guilty of negligence.

3. Frank Giaraffa, as a person performing the ship's service, was owed the warranty of seaworthiness by Moore-McCormack.

4. The MORMACBAY was unseaworthy as to Frank Giaraffa.

5. The negligence and the unseaworthiness were the proximate cause of Giaraffa's injuries.

6. Giaraffa was in no way guilty of contributory negligence.

7. Moore-McCormack is entitled to be indemnified by Atlantic Coast since Atlantic Coast has breached its warranty of workmanlike service to Moore-McCormack.

8. This indemnity includes counsel fees.

It is the judgment of this court that Frank Giaraffa recover from Moore-McCormack the sum of $158,803.25. Moore-McCormack is to be indemnified by Atlantic Coast in the same amount. Moore-McCormack is also to be indemnified in the amount of the reasonable value of its counsel's services in this action. If Moore-McCormack and Atlantic Coast cannot between themselves determine what the reasonable value of these services is, the court, upon application for a hearing, will hold a hearing to determine this amount.

So ordered.