CONTINENTAL SWEDEN CORPORATION, LTD., as Owner of the M/V NAN FUNG, Plaintiff,

v.

M.P. HOWLETT, INC. and Weeks Stevedoring Co., Inc., in personam, and the BARGE WEEKS 515, in rem, Defendants.

No. 87 Civ. 638 (MEL).

United States District Court, S.D. New York.

Aug. 22, 1989.

---

Haight, Gardner, Poor & Havens, New York City (James T. Shirley, Jr., of counsel), for plaintiff.

Lawrence M. Honig, New York City, for defendants.

LASKER, District Judge.

Continental Sweden Corporation ("Continental") instituted this action seeking recovery for costs and expenses incurred as a result of damage caused its ship, the M/V Nan Fung ("the Nan Fung"), by defendants M.P. Howlett, Inc. and Weeks Stevedoring Company, Inc. ("stevedore" or "defendants").[1] Specifically, plaintiff maintains that the defendants are responsible by virtue of their negligent discharge of rock salt from the Nan Fung's cargo hold for both the cost of repairs as well as the value of its cancelled charter party. The defendants having conceded liability for the damage to the Nan Fung's hold,[2] the disputed issues concern the reasonableness of plaintiff's decision to decline the defendants' offer of a temporary repair to the damage and the propriety of the claim for the lost charter party, which accounts for over $150,000 of the $220,000 in damages sought by the plaintiff.

This action was tried over the course of eight days, beginning in January, 1988 and resuming, because of the court's calendar and counsel's health, only in May, 1989. Plaintiff maintains that the evidence at trial establishes that it acted reasonably when refusing to accept the stevedore's offer of repair, because one proposed repair could

---

1. According to counsel for the defendants, M.P. Howlett and Weeks Stevedoring Co. are for the sake of this action one and the same. Trial Transcript ("T.") at 5. Plaintiff's action also includes an *in rem* claim against the Barge Weeks 515.

2. T. 831–32.

not have been performed timely in a safe fashion; both created risk of further damage to the ship, and both would not have sufficed to enable the ship to fulfill the terms of the next charter party and thus avoid its cancellation. In response, defendant maintains that the evidence shows that repairs of the form offered by the stevedore are routinely made and approved in comparable circumstances and that the vessel, if repaired in the manner proposed, would have satisfied the conditions of the charter party. Accordingly, the defendants argue, consistent with its duty to mitigate the damages, the plaintiff was obliged to accept the offer. Moreover, defendants dispute the very existence of the charter party and contend that plaintiff failed in other ways to mitigate its damages.

This decision constitutes the findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure. I conclude that, in light of the technical evidence adduced at trial, the plaintiff's decision was reasonable. Moreover, plaintiff satisfactorily established the existence of the charter party and the defendants failed to prove that the plaintiff did not fulfill its obligations to mitigate the damages. Finally, plaintiff's post-trial request for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure is denied.

## I. FACTUAL BACKGROUND

The Nan Fung, a bulk cargo vessel and the only vessel owned by the Finnish, family-run plaintiff company, arrived at the Atlantic Salt Terminal in New York on June 10, 1985 for completion of the discharge of its cargo of salt. Weeks Stevedoring Company, which was retained to remove the remaining 27,000 tons of salt from the Nan

Fung, damaged the port side of hold number five and the underlying fuel tank during discharge, leaving two indents of approximately twenty inches by twenty inches. Although the stevedore finished discharging the hold in the early evening of Friday, June 14, the damage was not discovered until Monday morning, June 17th, at 8:30, when the ship's second mate examined the hold.[3] T. 157. The stevedore did not report the damage on Friday, T. 158; during the weekend the ship was bunkered, but no cargo was discharged, T. 155–56.

After learning of the damage, the Master of the ship, Captain Pertti Peltonen, a native of Finland, prepared a letter of protest, which stated in relevant part:

> If you cannot repair the above-mentioned damage during ship's stay at New York, we will hold you[ ] full[y] responsible for any consequences that may arise therefrom.[4]

The Captain did not at the time know how much longer the ship would remain in New York nor was he contemplating particular damages. T. 207, 258–59. Specifically, the Captain had not been advised that the owner of the Nan Fung had arranged a subsequent charter party, described below, the cancelling date of which was June 19th, T. 199–201, 260; he did, however, understand that the ship had further employment because he had been advised to bunker the vessel for a voyage to Northern Europe, T. 198–99.

The Captain's letter advising the defendants of the damage was sent to and received by the stevedore early on the afternoon of June 17th. On that day, Monday the 17th, the Captain also notified Marku Tuuli, the ship's owner, and Jake Mayer, the agent for the charterer,[5] of the damage.

---

**3.** It was the stevedore's practice to advise the captain of any damage it noticed while cleaning the hold, T. 27, but not to inspect the hold for such damage because the master normally monitors the removal and thus notifies the stevedore of any damage observed. T. 840–41. It was also normal practice, according to the captain, for the staff of the ship to inspect a hold after the discharge of its cargo was finished to deter-

mine what cleaning was necessary before the next loading. T. 157–58.

**4.** Plaintiff's Exhibit ("PX") 6 (Letter of Pertti Mikael Peltonen to Stevedoring Department "Weeks 515," dated June 17, 1985).

**5.** In effect, Mayer also served as agent for the ship. T. 750.

On the morning of the 18th, Hedley Weeks, a principal of Weeks Stevedoring Company, and Herbert C. Phelps, the marine surveyor sent by the vessel's underwriters, each inspected the damage and then spoke with the Captain, in the presence of the vessel's chief engineer and mate. There is no dispute that during the course of conversation there was discussion of variously using either a welded doubler, a bolted plate, or an insert to repair the damage.[6] The testimony conflicts, however, about who said what about the repairs and at what time. Whereas Phelps testified that Weeks suggested that the damage be repaired with a welded doubler or bolted plate, T. 315–16, both of which are undisputedly temporary repairs of the nature of a patch, Weeks maintains that these repairs were first suggested by Phelps, T. 717. There is no dispute, however, that Weeks offered to repair the damage with either a welded doubler or bolted plate, but declined to offer a welded insert as a repair because it required that the tank be "gas-freed," a more expensive and time-consuming procedure. Nor is there any dispute that Weeks did not propose to gasfree the tank during the welding necessary for the doubler, but instead proposed to fill the tank with water during the process. Finally, Weeks testified that he did not recall that either Phelps or the chief engineer objected to the repairs when offered. T. 895–96.

The Captain reported the offers of repairs to the owner, Marku Tuuli, by phone that morning in the presence of Weeks. T. 269–70. Weeks testified that the Captain called Tuuli twice, first to advise him of the offer of a bolted gasket and second to tell him of the welded doubler offer. T. 717, 720. Peltonen cannot remember whether he made one or two calls. T. 227–28. According to both Tuuli and Peltonen, the Captain advised Tuuli during these calls that the chief engineer disfavored the welded doubler because the water with which the tank would be inerted during the welding might later mix with the fuel and thereby harm the engine and that Phelps expressed concern that the temporary repairs proposed by Weeks would pose safety problems and might not be acceptable to Lloyd's. T. 187, 378, 380. According to Tuuli and Peltonen, no decision was made on the 18th whether to accept Weeks' offer of repair; instead, the decision was deferred until Lloyd's Register of Shipping ("Lloyd's"), the authoritative classification society, surveyed the damage on June 19th. T. 269–70, 273–74, 381–82. However, Weeks testified that the Captain advised him, after speaking with the owner, that his proposed repairs were unacceptable. T. 719, 722.

At no time during the afternoon of June 18th did the Captain tell Weeks or Phelps how much longer the ship was to remain in New York. In fact, the Captain testified that, although Tuuli emphasized that the ship was in a hurry to go on, the Captain did not know how long the ship was to remain in New York. T. 259–60. Tuuli, however, said that he advised the Captain on the 17th of its cancelling date of the 19th. T. 401.

In the afternoon, the stevedore sent to the captain a letter reiterating the offer to patch the damage with a welded doubler. The letter stated in relevant part:

> With the advice and consent of the P & I Underwriter, we are prepared to make repairs to the damaged fuel tank in the #5 Lower Hold by removing the fuel, pumping the tank full of water, welding in a doubler and thereafter, at our expense, removing the water from the tank. We are advised that this repair will be in all respects seaworthy to the vessel and will be done immediately at our cost and expense which should not exceed $5,000.[7]

---

6. The welded doubler, like the bolted plate, were both characterized as "patches" or temporary repairs. With both repairs, the damaged area is covered on both sides by a plate, which is then affixed with a weld or bolt. In contrast, when the repair is fixed with an insert, the plate is fitted into, rather than placed over, the area of damage. Thus, unlike the two welded doubler or bolted plate, an insert is flush with the slope's plate.

7. PX 7 (Letter of Gerard S. Dillemuth, Secretary–Treasurer of M.P. Howlett, Inc. to Captain

The letter also stated that, if the proposed repair were not accepted, the defendants would "resist any further claim for repairs at another port which exceed $5,000." [8]

Also, in the afternoon, Phelps conducted a joint survey of the damage with Robert Reutti, who was surveying the damage for the defendants' insurer, Midland Insurance Company. The survey, prepared that afternoon, recommended a permanent repair, namely a welded insert, and noted that a chemist should issue a gas free certificate for the hot work, which in this case referred to the necessary welding.[9] Moreover, discharge of the vessel's cargo was completed on Tuesday, the 18th, thus enabling the vessel to proceed but for the need to repair the damage.

On the 19th, N. Jessen, Lloyd's surveyor, examined the damage. His report states in relevant part:

> It is recommended by me and agreed to by the Captain of the subject vessel, that a permanent repair is to be carried out before vessel leaves this port.
>
> The subject tank is to be gas freed.... [10]

Captain Peltonen testified that, in addition to making the recommendation included in his report, Jessen stated

> that the temporary repair method was not acceptable to them and the ship would get a permit to proceed only to the next destination using that method.
>
> The Lloyd's man further explained that ... even if the temporary repair is performed, the tank has to be made gas free....

T. 174. In an answer to an interrogatory, when describing the advice given to the master about the proposed repairs, plaintiff states in relevant part that "[t]he class surveyor told the master that such repairs as were offered in Weeks' letter (i.e., welded—not bolted) could be accepted as temporary repairs only if permanent repairs would be made in the vessel's next port of call as a condition of class." [11] Both Peltonen and Tuuli testified that, after the Captain advised Tuuli of Jessen's recommendation, Tuuli decided that a permanent repair of the form of an insert was necessary, T. 188, 381–83, and the Captain so advised Phelps, T. 292.

At approximately 2:00 p.m. on the 18th, the ship traveled to Bay Ridge Flats. The permanent repair of the form of an insert was complete on approximately June 26; the repairs were tested and approved by Lloyd's on July 1st. During the period of the repairs and until the crew loaded its next cargo in Newark on August 8, 1985, the ship incurred expenses, including the cost of transporting the crew to and from shore, bringing water for drinking and cooking to the ship, and paying for necessary goods and salaries.

The greatest expense claimed and the only one seriously disputed in this litigation was the loss of the charter party, for which the final delivery date was June 19th. Mieczyslaw Mojsa, who in 1985 was the manager of the chartering department of Polfracht Shipbroking and Chartering Company, a Polish company that was one of two companies that arranged charters for the plaintiff, testified that, on May 28, 1985, he and Tuuli negotiated and agreed to the terms of the charter party. T. 22–23. Under its terms, the Nan Fung was to be delivered, sometime between June 12–19, at a port to be identified by the charterer. According to Mojsa, Tuuli kept Polfracht advised of the vessel's location and gave the required notices of delivery, T. 63–67,

---

Pertti Mikael Peltonen and Jake Mayer, dated June 18, 1985).

**8.** *Id.*

**9.** PX 8 (Field Survey Report of Herbert C. Phelps and Robert W. Reutti, dated June 18, 1985).

**10.** PX 11B (Statement of N. Jessen, Surveyor to Lloyd's Register of Shipping, dated June 19, 1985).

**11.** Defendants' Exhibit ("DX") Z, Question 7(c) of Defendants' Second Interrogatories (Plaintiff's Supplemental and/or Amended Responses to Defendants' First and Second Interrogatories, and to Defendants' First and Second Requests for Production of Documents, and Plaintiff's Responses to Defendants' Third Interrogatories and Request for Production of Documents ("Responses to Interrogatories"), dated Oct. 9, 1987).

and both Mojsa and Tuuli testified that the pilot's station of New York was unofficially designated as the port of delivery, T. 78, 444.

According to the terms of the agreement, the vessel was to be, upon delivery, "in every way fitted for ordinary cargo service" and "in every respect ready to load harmless bulk cargoes, if rejected vessel to be off-hire from time of rejection until time of acceptance."[12] The owner was to be paid $5,000 per day for the thirty days during which the vessel was to be employed. Mojsa testified that he and Tuuli agreed to keep the terms of the charter confidential, T. 61. On June 17th, when Tuuli first learned of the ship's damage, he attempted to contact Mojsa; on the 18th, when he first reached Mojsa, Tuuli advised him that there had been some damage, and asked if the date of delivery could be extended by four, five, or six days. T. 376. Mojsa told Tuuli only the following day that an extension would not be acceptable. *Id.* The repair which Tuuli ultimately decided was necessary—the welded insert—could not have been and was not complete in time for the Nan Fung to be delivered to the pilot station of New York on the 19th. Accordingly, Polfracht cancelled the charter party. In a letter of June 20, 1985, the charterers stated:

> We hereby confirm that due to Owners failure to deliver the above mentioned Vessel by agreed cancelling date the Charterers are utilizing their option ... of cancelling the Charter Party dated as above [28th May 1985].
>
> Therefore this Charter Party is to be considered as cancelled.
>
> The above is to confirm Charterer's verbal declarations in this respect.[13]

At the time Tuuli and Mojsa agreed to the charter party, Mojsa had observed an upward trend in the market, making the contract advantageous. T. 22. However, when Tuuli requested additional time in order to meet the cancelling date, the market had changed, thereby creating an incentive for the charterer to disfavor the extension. T. 42–43, 479.

## II. DISCUSSION

The issues for decision are: First, did the plaintiff establish the existence of a charter party? Second, was the plaintiff's decision to decline the defendants' offers of repair reasonable? Third, did the plaintiff's failure to notify the stevedore of the damage on June 14 or to alert the surveyors and defendants of the delivery date of June 19 constitute a failure to mitigate damages? Fourth, does the plaintiff's failure to notify the defendant of the claim for the lost charter party until ten months after the incident bar the claim?

### A.

The defendants maintain that there was no charter party between the plaintiff and Polfracht. In support of this argument, the defendants point to Tuuli's acknowledged failure to return to Mojsa a signed copy of the charter party agreement, the plaintiff's failure to make a claim for the loss of the charter party for ten months after all the facts necessary to make such a claim were known to it, the failure of the master to advise anyone of any details of the charter party, and the testimony of Phelps and Weeks that Jake Mayer, who acted as the ship's agent, stated that the Nan Fung had no subsequent employment. The defendants' argument is unpersuasive in light of the credible evidence introduced by plaintiff establishing the existence of the charter party.

The first two factors certainly suggest, as Tuuli himself and other witnesses acknowledged, unusual, if not unwise, business practice. However, they do not suffice to undermine the credible testimony of Tuuli and Mojsa that they had negotiated and agreed upon the terms of the charter party. Nor does Tuuli's failure to advise or instruct Peltonen to advise any other

---

**12.** PX 4, clauses one and twenty-eight (Uniform Time–Charter signed by M. Tuuli, for the owners, and M. Mojsa and S. Bielski, for the charterers).

**13.** PX 5 (Letter of M. Mojsa and J. Bielski of Polfracht Shipbroking & Chartering Co., for the Charterers, to Continental Sweden Corp. Ltd, dated June 20, 1985).

party of the cancellation date or of other details of the charter party negate its existence. Mojsa testified that they agreed, as a term of the contract, not to reveal the terms of the charter party to others. Even Jake Mayer and Charles Aitcheson, witnesses for the defendants, testified that such a practice was not unusual. T. 760, 985–86. Admittedly, the plaintiff could have advised the defendants or surveyors that the Nan Fung had commercial commitments requiring it to be fit for cargo and seaworthy in all respects by the 19th, without disclosing the existence or details of the charter party. However, it does not follow that the charter party did not exist simply because plaintiff failed to disclose the cancellation date; as late as June 18, according to Mayer, the vessel, had it been seaworthy, could have been prepared for a timely delivery to the pilot station of New York harbor. T. 771.

▮ Nor does the testimony about Mayer's statements on the 18th or his own examination indicate that the Nan Fung had no subsequent employment. Phelps testified that, during his conversation with Mayer on June 18th, Mayer indicated "[t]hat he was trying to get together a cargo of scrap iron for the Nan Fung." T. 612. Weeks wrote in his notes of June 18th: "Jake Meyer made the point that the ship has no employment. All the more reason for the owner to drag out repair." [14] This testimony cannot be used, as defendants suggest, to establish that the charter party was nonexistent, because it is hearsay.

Even the testimony of Phelps upon which defendants rely is insufficient to support their argument. The direct examination of Phelps included the following testimony:

Q: Reading from Exhibit D [the notes of Weeks], in part, on the second page, "Jake Meyer made the point that the ship has no employment. All the more reason for the owner to drag out repair."

Having heard this statement read from this Exhibit D, does it refresh your recollection that you and [Hedley] Weeks had a talk about this subject on June 18, 1985, in the afternoon?

A: If [Hedley] Weeks says so, because [Hedley] Weeks doesn't lie, in my opinion, so there could have been something like that.

T. 783. However, this testimony, whether argued to be an admission or not, does not suffice to indicate that the charter party did not exist. First, Mayer did not state that the Nan Fung had no subsequent employment, only that he may have made the statement that Weeks attributes to him. The statement is at best inconclusive and contradicts his earlier, more direct statement:

Q: By the way, Mr. Mayer, did you ever tell [Hedley] Weeks ... that the ship had no employment?

A: No, sir. I personally didn't know whether the ship had or had no employment. So anything I said, may have said, would be that I don't know.

T. 778. Second, even a bald statement that the charter party had no employment would not be conclusive. Rather, such a statement would only confirm the testimony of Tuuli and Peltonen that Peltonen was neither instructed nor did he of his own accord tell Mayer about the charter party. Thus, the statement could not constitute an admission, there being no testimony that Mayer was told by one of the principals that the Nan Fung had no subsequent employment.[15] Moreover, Mayer testified that this secrecy was not unusual, T. 760, nor would it frustrate the vessel's ability to comply with the charter party's terms, as he could within 10 to 24 hours make all arrangements necessary to tender the vessel to the pilot station, T. 771. Finally, during his own testimony, Mayer was not asked, and thus did not testify, that as of

**14.** DX D (Notes of Hedley Weeks, made on June 18, 1985).

**15.** In addition, even if Mayer testified that the plaintiff's principal told him that the vessel had no future employment, there would be a ques-

tion whether that statement would constitute an admission against the plaintiff. Although Mayer performed the duties of the ship's agent, he was hired by the charterer, not the plaintiff. T. 791.

the time of the damage he was seeking employment for the vessel.

Defendants simply have not pointed to evidence of record sufficient to undermine the proof of the charter party put forward by the plaintiff, including the credible testimony of Tuuli and Mojsa, the actual charter party agreement, and the letter confirming its cancellation. In addition, Peltonen not only was aware of future employment, he was instructed to and did bunker the ship in anticipation of a forthcoming voyage. This evidence suffices to establish the existence of the Polfracht charter party.

### B.

The reasonableness of the plaintiff's decision to decline to accept the repairs as proposed by the defendants, has two components. First, was it reasonable of the plaintiff to demand that the damage ultimately be repaired with an insert? Second, was it reasonable to require that the damage be repaired with an insert at the time?

As to the first question, there is no serious dispute. Every surveyor who inspected the damage recommended that it be repaired with a permanent insert and such a repair was unquestionably a condition of class, to be performed, if not on June 18, then when the Nan Fung arrived at its next port of call. Moreover, even the witnesses for the defendants emphasized the acceptability of the welded doubler or bolted plate only as a *temporary* repair. Thus, I conclude that the defendants are liable for the expenses incurred for and associated with the insert.

There is, however, a serious dispute whether it was reasonable to insist that the damage be repaired with an insert on June 18, rather than at such time as it arrived at the next port. The parties agree that, had the damage been patched with a bolted plate or a welded doubler, the welding being done while the tank was filled with water, the repairs could have been accomplished in a matter of hours and the ship delivered to Polfracht on the 19th, but that a timely delivery was impossible if it was necessary to free the tank of gas in order to repair the damage, whether with an insert or a welded doubler.

The reasonableness of the plaintiff's decision is governed by the standards articulated in *Ellerman Lines, Ltd. v. The President Harding*, 288 F.2d 288, 290 (2d Cir.1961) and its progeny. Judge Friendly, writing for the court in *Ellerman*, stated that "a tort defendant is not liable for consequences preventable by action that reason requires the plaintiff to take...." *Id.* at 290. The wrongdoer, in this case the stevedore, bears the burden of establishing that the plaintiff failed to minimize damages.

> Thus, although the injured party is precluded from recovering for damages caused by his unreasonable conduct after the injury, the defendant must demonstrate (1) that the conduct was unreasonable, and (2) that it had the consequence of aggravating the harm.

*Tennessee Valley Sand & Gravel Co. v. M/V Delta*, 598 F.2d 930, 933 (5th Cir. 1979). *But see Pan–American Petroleum & Transport Co. v. United States*, 27 F.2d 684, 686 (2d Cir.1928) (eventual proof of reasonableness of decision rests upon vessel owner). Moreover, "[i]t is not fatal to recovery that one course of action, reasonably open but not followed, would have avoided further injury whereas another, also reasonable and taken, produced it." *Ellerman*, 288 F.2d at 290. *See also Federal Ins. Co. v. Sabine Towing & Transp. Co.*, 783 F.2d 347, 350 (2d Cir.1986). Evaluating the testimony of the witnesses for the plaintiff and defendants by this standard, as described below, it is clear that the plaintiff's decision to decline the defendants' offer of repair was within the "range of reason"; no more is required. *Mecom v. Levingston Shipbuilding Co.*, 622 F.2d 1209, 1214 (5th Cir.1980).

### 1. Technical Evidence

Herbert Phelps, a witness for plaintiff, who has experience as a marine surveyor not only for the underwriter he represented on the 18th, but also as a surveyor for the American Bureau of Shipping, offered a credible explanation for his objection to the

defendants' offers of repair. His explanation was supported by the testimony of plaintiff's expert, Admiral Robert Price, who has had extensive education in ship construction and experience with the Coast Guard. Although both men, unlike defendants' experts, lack commercial experience, their experience with and understanding of ship repair was extensive and their testimony as to the safety of the repairs offered was pertinent as well as persuasive.

Both men explained in particular the dangers presented by the use of the temporary repairs proposed, and particularly of inerting the fuel tank in order to perform the welding. Their testimony was contradicted at times by the testimony of the defendants' expert, Charles Aitcheson, President of ASCA Marine, Inc. and CAPS Marine Corp. and a veteran of the commercial shipping industry since 1956, and deflated at other times by cross-examination. The evidence is summarized below.

First, according to Phelps and Price, both the welded doubler and the bolted gasket, unlike an insert, involve a "patch" over the damage. Accordingly, the repair is not flush with the slope plate. As a result, in future cargo discharges, there is a greater risk that the crane will catch the protrusion and thus further damage the vessel. T. 326, 1163. Second, as Price elaborated in detail, both repairs fail to address what he characterized as "the notch effect." According to Price, if there is a crack, as there was in this instance in the plate of the vessel, "you have a potential for a crack to continue to run from that puncture, depending on how highly stressed that location is." T. 1077. Price testified that neither repair proposed by the defendants addresses the notch effect, T. 1077, 1082–83, and that the bolted plate may in fact worsen the effect because it adds more holes to the situation. T. 1078.

The bulk of the testimony addressed the dangers presented by the welded doubler, when affixed while the fuel tank was filled with water. According to both Phelps and Price, if the tank is full of water during the welding, the water absorbs heat, often prompting the welder to increase the heat and thus the risk of burning through the slope plate and also making it more difficult to achieve a strong weld. T. 327, 1084.

In addition, the impurities from the water remaining in the tank would contribute to the "rapid and serious erosion of the [engine's] cylinder liners, the piston rings, the valve seats, the valves themselves, [and] the turbo chargers." T. 331. *See also* T. 1086. Phelps in particular acknowledged that settling tanks and other devises designed to separate water from any fuel in which it has become mixed can minimize these problems. T. 661–63, 667–69. However, Phelps also emphasized that this equipment decreases in effectiveness when the motion on the sea intensifies and that the equipment cannot separate impurities once emulsified. T. 685–87.

The most serious problem presented by the method by which the stevedore proposed to accomplish the temporary repair arises when the welded doubler is removed, as would be necessary to replace it with an insert.

> [T]he fuel can seep in the annular space between the existing slope plate and the bottom surface of the steel doubler, so that when the cutting torch is applied to remove the doubler plate in order to make permanent repairs, there is a risk of explosion, because in gas-freeing the tank you cannot get the oil and gases out of that annular space.

T. 327. Price similarly spoke of the difficulty presented in later attempts to gas-free the tank, were the damage repaired with a welded doubler, because oil residues are likely to collect in the pocket between the two plates. T. 1081. Phelps indicated that the oil was less likely to become trapped in the annular spaces if the repair were caulked, which he stated Weeks offered to do, but that the caulking can let go if the ship bends during the motion at sea. T. 328.

Finally, Admiral Price opined that the welding process as proposed by Weeks did not comply with the law. According to Price, because of the safety risk, the regulations of the Occupational Safety and Health Administration ("OSHA") require

that hot work, including welding, performed by ship repairers be performed when the tank is gas-free, unless a marine chemist certifies that the work may be safely performed in another fashion. T. 1078.

### 2. Experience

The technical testimony offered by the plaintiff was supplemented by that of Peltonen and Phelps, both of whom testified that they had never seen these temporary repairs on a fuel tank. T. 243, 649. Their experience, however, was contradicted by that of Weeks and Aitcheson, both of whom testified that they had been involved, as the stevedore or agent, in situations in which damage comparable to that sustained by the Nan Fung had been repaired with a welded doubler. Both men also stated that it was customary in the port of New York to accept the repairs offered as seaworthy, even when proposed to cover damage to a fuel tank.

Hedley Weeks testified generally that he had on other occasions repaired damage to a fuel tank with a welded doubler while the tank was filled with water, rather than gas-free. T. 724–25, 828–29. He testified that, on the approximately twenty to thirty occasions in which he repaired the damage of a puncture in the plating caused during discharge, T. 836, he did not gas free the tank, T. 889, and that the repairs he made in those instances were examined and approved by the class surveyors. T. 892. Weeks stated that he had put a temporary repair on damage to a fuel tank on a vessel known as the Angel and he spoke in detail about his experience repairing the damage on the AXI. In April, 1988, his stevedoring company damaged the slope plate and fuel tank of the AXI during discharge of its cargo. The classification society approved the temporary repair of the damage with a bolted doubler, with the understanding that the temporary repair would later be replaced with a permanent one. T. 900–02.

Aitcheson also told of the acceptance of temporary repairs to damaged fuel tanks, accomplished with the tank inserted during any necessary welding. T. 958–59. Aitcheson stated that he had had experi-

ence with "a number of vessels" in which the damage was similar to that on the Nan Fung in which the repair consisted of a welded doubler or bolted gasket. *Id.* Specifically, he testified that he represented the ship owner of the Angel I, which sustained damage to a fuel tank very similar to that of the Nan Fung. With the supervision and approval of the classification society, a doubler was welded over the hole and the tank filled with water during the process, T. 971. To the best of Aitcheson's knowledge, the Angel I went on to carry cargo. T. 959–60. Never in his experience did the surveyor reject the offer of a temporary repair to a fuel tank or require a certificate that the tank was gas-free before permitting the welding. T. 964, 1003.

Finally, defendants offered the testimony of Terry Howson, a senior ship and engine surveyor with Lloyd's. He testified about his experience as the surveyor for Lloyd's of the damage to the Lake Star, also a bulk cargo vessel. Initially, Howson recommended a permanent repair for the damage to the water ballast tank. However, at the request of the master, he agreed to a temporary repair, that would enable the vessel to meet urgent cargo commitments, provided the repair was reexamined in a year. T. 553–56, 570–71. Normally, according to Howson, if heat were used and there was gas, gas-freeing would be required, T. 588–89; if the repair were of the form of a welded doubler and the area to be repaired involved a fuel tank, "the repairers would have to concern themselves ... if they were applying heat to an area that was not gas free." T. 589.

\* \* \*

Although the witnesses for both plaintiff and defendants testified credibly, the witnesses for the plaintiff offered fuller, more persuasive explanations for their opinions, the shortcomings of their knowledge were less troubling, and the specific experiences of which the defendants testified were in most instances distinguishable.

It is certainly true that the defendants, through cross-examination of plaintiff's witnesses and direct examination of their own witness, placed the risks discussed by

plaintiff's technical experts in perspective and often in so doing minimized their hazard. For example, the risks of the crack expanding because of the notch effect and of further damage because of the protrusion of the patch are common to all temporary repairs. Yet, even plaintiff's witnesses acknowledged the regular use of such repairs, disputing their safety and seaworthiness when applied to a fuel tank. The repair also may not have posed a serious risk to the engine in the fashion described by Phelps and Price because, in this instance, at the time the damage was discovered on the 17th, the vessel had already been bunkered for its next voyage. In other words, there may have been no need to use the fuel tank in hold number five during the next charter party. Finally, even the possibility that gas would collect in the pockets of the plate could be minimized by caulking the area.

Nevertheless, I decline to find that the plaintiff's refusal to accept these risks was unreasonable. The defendants did not manage through the direct or cross examination of any witness to diminish the seriousness of the risk of possible explosion in the future, which would present a risk both to workers and the vessel, except to the extent that both Weeks and Aitcheson said that no such explosion had occurred in their experience. The plaintiff's concern with the risk is particularly reasonable, in light of its need in order to stay in class with Lloyd's to replace the welded doubler with an insert, a procedure that would require hot work. Moreover, the seriousness of the risk is underscored by the numerous cases in the admiralty field involving injury sustained during an explosion while welding in the vicinity of gas vapors. *See e.g. Duplantis v. Zigler Shipyards, Inc.*, 692 F.2d 372 (5th Cir.1982) (per curiam) (welders injured during explosion while repairing leak on tank barge that had transported crude oil; meter used to measure whether barge was gas-free was defective); *Hughes v. Chitty*, 415 F.2d 1150 (5th Cir. 1969) (employee injured in explosion while performing hot work in area not gas-free);

*Gary v. Northern Barge Line Co.*, 440 F.Supp. 260 (E.D.La.) (employee killed in explosion where conditions changed from time of defendant marine chemist's issuance of gas-free certificate), *aff'd*, 563 F.2d 782 (5th Cir.1977); *Complaint of Allied Towing Corp.*, 409 F.Supp. 180, 185 (E.D.Va.1976) (finding that failure to gas-free tank barge before welding was cause of explosion), *aff'd in part and vacated in part*, 580 F.2d 702 (4th Cir.1978).

Had the defendants presented more persuasive evidence of the safety and acceptability of the repairs as proposed in Weeks' letter of June 18th perhaps I would be convinced that the concerns as articulated by plaintiff were insufficient to make its decision reasonable. However, not only was most of the testimony about the safety too general to be persuasive, even in those instances in which Weeks, Aitcheson, and Howson spoke of specifics the detail was either limited or distinguishable. For example, Howson's experience with the Lake Star, in which the water ballast tank was damaged, is not probative of the seaworthiness of the repair to the damage at issue. Although the damage to the Angel was on the fuel tank, Weeks' notes of the incident suggest that the tank might not have been active. The notes state that the tank at the time was empty, but that it had "had heavy fuel in it previously—maybe 1 year ago." [16] Accordingly, it would stand to reason that there would be a lower concentration of gas residue in the tank and thus the possibility of an explosion would be reduced. Finally, the probativeness of the AXI and Angel examples is limited in light of lack of detail that would enable the court to compare effectively the damage in those cases to the one at hand, the only evidence as to those incidents being the general testimony of Weeks and Aitcheson, supplemented only by photographs of the damage and, in one instance, Weeks' notes.

Thus, although the defendants effectively placed the safety concerns of the plaintiff in context, plaintiff has nevertheless established that its decision to decline the offer of repair outlined in the letter of June

---

**16.** DX Y (Undated notes of Hedley Weeks about    the Angel I).

18th was reasonable. There was no showing that the plaintiff's concern that the method proposed by the defendant of inerting the tank could increase the likelihood of an explosion during subsequent repair was unfounded. Moreover, plaintiff's concern with the potential complications for the engine caused by water and the problems with securing a satisfactory weld are not unfounded, even if those problems could be alleviated. In addition, the familiarity of plaintiff's witnesses with applicable safety regulations and specifically the need for a marine chemist to issue a gas-free certificate before any hot work is done lent their testimony particular credibility.

■ Finally, as Judge Rubin emphasized in *Tennessee Valley*, the injured party is permitted "wide latitude in determining how best to deal with the situation." 598 F.2d at 933 (citations omitted). Plaintiff's conduct fell within "the range of reason," even if the "full light of reason" would have, if brought to bear, modified plaintiff's decision. *Ellerman*, 288 F.2d at 290. Defendants, as the ones responsible for the injury, should, as I find they must in the case at hand, bear the cost of the reasonable, even if imperfect, decision.

*Pan–American Petroleum & Transport Co. v. United States*, 27 F.2d 684 (2d Cir. 1928), upon which defendants rely, is not to the contrary. In that case, the court affirmed the holding below that the defendants were not liable for detention damages, because the plaintiff's decision to repair the collision damage immediately was unreasonable. However, there, unlike the case at hand, the parties stipulated that "the collision repairs were not necessary to the ship's seaworthiness." *Id.* at 685. Moreover, the court stated:

> [T]he tort-feasor may not complain if, in the situation in which the collision has placed the owner, he is reasonably apprehensive as to the seaworthiness of his ship. No one is obliged to take chances in the interest of one who has wronged him.

*Id.* Here, Continental Sweden has established that its apprehensions as to the seaworthiness of the Nan Fung with the bolted plate or welded doubler were reasonable.[17]

■ Two further comments are in order. First, the conclusion that plaintiff's decision was reasonable does not rest in any way on the recommendation of Jessen, the Lloyd's examiner. He was unavailable to testify. The only evidence of his willingness to approve the welded doubler as a temporary repair came through the plaintiff's answers to interrogatories and the testimony of Captain Peltonen, which were hearsay. Moreover, the testimony as to Jessen's willingness to accept the repair if performed without the fuel tank being gas-free is at best inconclusive and at worst inconsistent. The plaintiff's answers to defendants' interrogatories state that Jessen said of the repair contained in the letter of June 18, 1985 that "the temporary repair would be subject to a class condition that it be replaced by a permanent repair at the next port of call"[18] and that "Class would accept a doubler, but only to proceed to next port where a permanent repair would be required."[19] Because the questions refer to the letter of June 18, which clearly states that the weld would be performed while the tank was gas-free, the answer suggests that the surveyor approved the method as well as the form of the repair. However, the Captain's testimony is to the contrary. *Cf. Giaraffa v. Moore–McCormack Lines, Inc.*, 270 F.Supp. 342, 348–49 (S.D.N.Y.1967) (admission made outside trial can be explained away by other evidence).

---

17. In light of the conclusion that the plaintiff's decision to require a permanent repair was reasonable given its safety concerns, it is not necessary to address plaintiff's additional rationale for its decision, namely that the vessel would not have been fit for cargo and seaworthy within the meaning of the charter party were it to have only a temporary repair.

18. DX Z, Responses to Interrogatories at Response to Question 7(c) of Defendants' Second Interrogatories.

19. *Id.* at Response to Question 10(b).

■ Second, despite plaintiff's argument to the contrary, I do not believe that the OSHA regulations require that the fuel tank in this instance be gas-free prior to any welding. *See* Occupational Safety and Health Standards For Shipyard Employment, 29 C.F.R. Part 1915 (1987). The standards of the National Fire Protection Association, which are incorporated into the OSHA regulations, speak of the need to clean *or inert* areas adjacent to the area in which the welding is done.

### C.

■ Defendants contend that the plaintiff failed to mitigate the damage by failing to notify the stevedore of the damage on June 14, rather than the 17th, and by failing to advise the defendants as well as the surveyors of the vessel's impending cancellation date. The defendants have the burden of proving that the plaintiff, by notifying it earlier of the damage or of the cancellation date, could have mitigated its damages. *See Tennessee Valley Sand & Gravel Co. v. M/V Delta,* 598 F.2d 930, 933 (5th Cir.1979) (collecting cases). *See also C. Itoh & Co. v. M/V Hans Leonhardt,* 719 F.Supp. 479 (E.D.La.1989) ("While the duty to mitigate lies with the plaintiff, the burden to show failure to mitigate is upon the defendant.") (citation omitted).

■ Although the argument is hardly frivolous, I conclude that the defendant has failed to satisfy the burden of establishing that the plaintiff could have, with earlier notification of the loss, avoided the consequence of losing the charter party. It is not clear that, even if the damage had been discovered on Friday, June 14, the repair could have been complete and the vessel delivered on the 19th. Reutti's survey report indicates that the actual repair work took approximately four days.[20] These calculations do not reflect the time necessary for the initial survey, the final inspection and approval by Lloyd's, or to travel to the site of the repair work. Thus, it was possible, but certainly not clear, that the damage could have been repaired and the vessel returned to the pilot station in time to satisfy the charter party.

Moreover, even if the repair could have been completed in time, the defendants have not established that the plaintiff failed to act reasonably by not inspecting the hold on the evening of the 14th. It is true that Tuuli testified that it "would have been better" had the damage been discovered at that time. T. 531. The Captain testified that it was "normal practice ... to examine the cargo hold after ... the previous cargo has been removed for the purpose of what cleaning messes are necessary for the next cargo." T. 157–58. He explained that the stevedore's workers were the last people on board the vessel on the 14th and that, over the weekend, the only activity aboard the vessel involved its bunkering. T. 155–56, 158. Moreover, he stated that the stevedore had not warned him to be on the lookout for damage it might cause. T. 159. Thus, it was reasonable, where the crew was not working over the weekend, that the second mate did not inspect the hold on Friday evening, but did so promptly on Monday morning.

In addition, the defendant has established no reason why the plaintiff was any more irresponsible for failing to notice the damage on the 18th than was the defendant.[21] Weeks testified that, while it is not the policy of his company to inspect the hold upon completion of discharge, any damage that is seen is to be reported. He stated that "about four men" would have

---

**20.** PX 10 (Report on Survey of Robert W. Reutti, dated July 16, 1985). Plaintiff contends that the repair took eight days. While it is true that the repair was completed eight days after the work commenced, the survey report indicates that there were two days on which no work was done; on the eighth day, there was no repair work, only the inspection; and on at least one of the other days, repair began only in the late afternoon.

**21.** Defendants' argument that the plaintiff bore this responsibility, because Mojsa testified that it was the custom to specify in contracts that the responsibility of supervising the stevedore rested with the owner, is unpersuasive. Mojsa was speaking of the assignment of responsibilities between the charterer and the owner, not the owner and the stevedore. Moreover, the question remains what "supervision" entails.

been in the hold on Friday afternoon in order to clean it. T. 841. In light of the presence of the stevedore's men in the hold, it is unreasonable to conclude that the plaintiff was solely responsible for the failure to discover the damage earlier.

Nor have the defendants proven that the plaintiff could have avoided the loss of the charter party by reporting the cancellation date to the stevedores and surveyor. There is no question that, even had the plaintiff so advised the parties on the 17th, any repair requiring the tank to be gas-free—which I have concluded was a reasonable decision—could not have been performed in sufficient time. Moreover, although the defendants introduced significant and credible testimony that surveyors would take commercial considerations into account when deciding what repair to recommend, suggesting that they might have approved a temporary repair, without requiring the vessel to be gas-free, had they known of the cancelling date, the defendants have introduced no evidence that that would have been the case in the instance of the repair to the Nan Fung. Proof that Howson changed his recommendation for the Lake Star from an insert to a welded doubler because of the vessel's commercial commitments does not establish that the Lloyd's surveyor would have done the same in this case, in which the damage was to a fuel rather than a water ballast tank. In other words, although the defendants have presented a sound argument, they lack the evidence to support it and satisfy their burden of proof on this point.

### D.

Defendants contend that the plaintiff's claim for the charter party should be disallowed because of the untimeliness with which it was called to the stevedore's attention. Plaintiff's own witnesses, including Tuuli, acknowledge that it was not sound business practice to notify the stevedores of the claim for the lost charter party no sooner than ten months after the accident. However, in order to invoke the doctrine of laches successfully in this case, defendants must show "not only undue prejudice, but also resultant undue prejudice." *West Wind Africa Line, Ltd. v. Corpus Christi Marine Serv. Co.*, 834 F.2d 1232, 1234 (5th Cir.1988). *See also Azalea Fleet, Inc. v. Dreyfus Supply & Machinery Corp.*, 782 F.2d 1455, 1458–59 (8th Cir.1986) (court in determining applicability of laches considers reasonableness of plaintiff's delay and "degree of prejudice suffered by the defendant due to the delay") (collecting cases); *Mecom Levingston Shipbuilding Co.*, 622 F.2d 1209, 1215 (5th Cir.1980) (same).

Defendants may not avail themselves of the doctrine of laches in the case at hand, as they have not established, let alone argued, any way in which they were prejudiced by the late notification. It is true that the defendants' insurer went into bankruptcy after the claim for the cost of the repairs was made, but before the claim for the lost charter party was asserted. However, defendants have not shown what, if any, injury resulted.

### III. SANCTIONS

In post-trial briefing, plaintiff moves for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure against the defendant. Plaintiff contends that sanctions are compelled because the defendants, although ultimately conceding liability, did so only on the seventh day of trial; the defendants found no law to support their contention challenging liability for Continental's loss of earnings; and counsel's "abusive characterizations" of Tuuli and excessive disputes over discovery and other matters. The motion is denied.

First, it does not follow that, because the defendants conceded liability, they had no good faith basis for denying it earlier, even if the basis for that denial was a question of the plaintiff's ability to prove it. In addition, although the concession came late in the trial, little time was devoted to the question of liability. Moreover, a similar argument might be made that the plaintiff could have abbreviated the time of the trial: For example, plaintiff argued that the law requires that the tank in this case be gas-free before welding, a statement of law which if accurate could have

obviated the need for a significant chunk of the testimony. It was not "patently clear that [the] claim ha[d] absolutely no chance of success" and thus that sanctions are appropriate on this ground. *Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir. 1986) (quoting *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987)), *cert. denied*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987).

■ Second, although the stevedore did not find cases directly on point to support its argument that it was not responsible for plaintiff's lost earnings because it was not notified of the cancelling date, the defendants' argument on this point was not without a good faith basis in the law. As is discussed above, the defendant established that surveyors consider commercial factors when deciding what repair to recommend and thus had some basis to argue that the plaintiff could have acted so as to avoid losing the charter party. Moreover, to the extent the plaintiff is suggesting more broadly that the defendants' argument that it was not liable for the loss of the charter party is unfounded, the plaintiff is mistaken. The defendants presented a strong case in support of their argument that the plaintiff's decision to require an insert at the time was unreasonable. There was unquestionably support for defendants' argument in existing case law. *See Eastway Constr. Corp.*, 762 F.2d at 254 (sanctions appropriate where "a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law....").

■ Finally, as any reading of the record will establish, the defense case was often litigated with a zeal that exceeded that which was appropriate, skirting into hostile questioning and accusations without sufficient need. While such conduct should not be condoned, I decline to treat it as a basis for Rule 11 sanctions.

\* \* \*

22. The expenses associated with the repair have

In sum, I conclude that the plaintiff's decision to require that the damage be repaired with an insert was reasonable and that the charter party not only existed, but also that the defendants have failed to establish that its cancellation was an avoidable consequence. Plaintiff has established with reasonable certainty the sum of this lost income as well as its expenses incurred for and during the repairs.[22]

Submit judgment on notice.

not been seriously contested.